Lori A. PILKINGTON, Appellant,

v.

Beverly M. KORNELL, Appellee.

No. 05–90–01513–CV.

Court of Appeals of Texas,
Dallas.

Dec. 17, 1991.

Rehearing Denied Feb. 5, 1992.

---

Melvin H. Wolovits, William T. Mitchell, III, Dallas, for appellant.

Steven R. Pierret, Arlington, for appellee.

Before WHITHAM, LAGARDE and WHITTINGTON, JJ.

## OPINION

WHITHAM, Justice.

Appellant, Lori A. Pilkington, sued appellee, Beverly M. Kornell, for compensatory and punitive damages allegedly suffered as a result of an automobile accident. The jury determined that Kornell's negligence proximately caused the accident but that Kornell was not grossly negligent. The jury awarded Pilkington some past and future medical expenses, but the jury found that Pilkington failed to prove that she suffered any damages which merited compensation for past and future (1) pain, suffering and mental anguish, (2) lost earning capacity, or (3) physical impairment. The trial court entered judgment on the verdict and overruled Pilkington's motion for new trial. The principal issue is whether the jury's findings of "zero" in response to questions of damages as to the three enumerated elements are against the great weight and preponderance of the evidence. We conclude that the findings are not against the great weight and preponderance of the evidence. Accordingly, we affirm.

In her brief, Pilkington advanced three challenges to the sufficiency of the evidence. In her first point of error, Pilkington contends that there was insufficient evidence to support the jury's findings of "zero" in response to questions of damages for past and future physical pain, mental anguish, loss of earning capacity and physical impairment. In her second point of error, Pilkington contends that the jury's findings of "zero" in response to questions of damages for past and future physical pain, mental anguish, loss of earning capacity and physical impairment are so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. In her third point of error, Pilkington contends that the trial court erred in overruling her motion for new trial

based on the jury's findings that Pilkington was not entitled to any damages for past and future physical pain, mental anguish, loss of earnings and physical impairment. At oral argument, Pilkington waived her first point of error.[1] As to Pilkington's third point of error, Pilkington tells us in her brief that, for the reasons stated in her brief under her first two points of error, the trial court should have granted Pilkington's motion for new trial. We turn then to consider the great weight and preponderance issue raised in Pilkington's second point of error. For the reasons that follow, we conclude that we must consider the issue in light of *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986).

## THE ZERO DAMAGES RULE

■ At the outset, we note that Pilkington's wording of her second point of error challenges the jury's awards of zero damages as against the great weight and preponderance of the evidence rather than as violative of the zero damages rule. Nevertheless, Pilkington, in her brief and at oral argument, asserts the zero damages rule under her second point of error and ignores construction of an argument to this court of a challenge as against the great weight and preponderance of the evidence. The so called "zero damages rule" dictates, in its most basic application, that, in cases involving unliquidated damages, the jury *must* award something for every element of damage "proved," or else the case will be remanded for a new trial. Gonzalez & Gilbreath, *Appellate Review of a Jury's Finding of "Zero Damages"*, 54 Tex.B.J. 418 (May 1991). As put by Pilkington in her brief: "A plethora of authorities exist supporting the proposition that the jury cannot ignore the inescapable fact that

[Pilkington] sustained some injury in the collision of November 2, 1987, and that in such event, the jury must award something for each and every element of damage resulting from the injury." In this connection, we point out that nowhere does Pilkington assert that the *amount* of damages sought was *conclusively* proved. Moreover, Pilkington failed to move the trial court to disregard the challenged findings. Thus, Pilkington does not claim that the amount of damages was conclusively proved by the evidence. In the present case, therefore, we have before us only the question of Pilkington's challenges to the jury awards of zero damages as being against the great weight and preponderance of the evidence. We read Justice Gonzalez to advocate in his article that appellate courts not use the zero damages as a substitute for well-settled standards of evidentiary review. *Appellate Review*, 54 Tex.B.J. 418. We dispose of the present case as advocated by Justice Gonzalez. Therefore, for the reasons that follow, we dispose of the "against the great weight and preponderance of the evidence" issue raised in Pilkington's second point of error in light of *Pool*. Indeed, we conclude that the recent Texas Supreme Court decisions cited below require us to dispose of Pilkington's second point of error in light of *Pool*.

■ Courts of appeals possess equal power to review the sufficiency of evidence to support both "yes" and "no" answers. *Herbert v. Herbert*, 754 S.W.2d 141, 145 (Tex.1988) (Chief Justice Phillips concurring). In considering great weight points complaining of a jury's failure to find a fact, courts of appeals should be mindful that a jury was not convinced by a preponderance of the evidence. Therefore, in such instances, courts of appeals are not

---

1. Were we to read Pilkington's first point of error as a legally insufficient or "no evidence" point of error, we could afford Pilkington no relief. *See Martin v. Warren & Miller Co.*, 639 S.W.2d 706 (Tex.App.—Tyler 1982, no writ). (Jury awarded appellant $750.00 and $1,165.10 for past and future medical care respectively and $1,950.00 in past lost earnings. However, the jury found "none" to the issues of past and future physical pain and mental anguish as well as loss of earning capacity in the future. *Mar-*

*tin,* 639 S.W.2d at 707.) In disposing of Martin's "no evidence" point, the *Martin* court pointed out that the "no evidence" point of error, which directs the appellate court to view the evidence in a light most favorable to the verdict and consider only evidence and inferences that support the verdict, is inappropriate. In the event of reversal and rendition, the appellate court cannot supply the amount of the appellant's damage. *See Martin,* 639 S.W.2d at 707.

entitled to reverse merely because they conclude that the evidence preponderates toward an affirmative answer. Reversal would be warranted only after a detailing of evidence under the *Pool* criteria indicates that the *great* weight of that evidence supports an affirmative answer. *Herbert*, 754 S.W.2d at 144 (emphasis in original). Hence, a court of appeals has the authority to review a "failure to find" in the same manner in which it may review a jury's findings. *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646 (Tex.1988). (The issue was whether a court of appeals has the authority to remand a cause for a new trial when it concludes that a jury's failure to find in favor of a party on a particular issue is "against the great weight and preponderance of the evidence." *Cropper*, 754 S.W.2d at 647.) Indeed, if there is any inference in *Pool* that there is a distinction between the court of appeals' review of findings and review of non-findings, the Texas Supreme Court has laid that question to rest. *See Cropper*, 754 S.W.2d at 649. Regardless of the manner in which the case was submitted to the jury, the court of appeals' jurisdiction extends to all fact questions in the case, whether the jury expressly or impliedly answered "yes" or "no" to a particular question. *Cropper*, 754 S.W.2d at 651. We conclude that "zero" is impliedly a "no" answer. Furthermore, as to remittitur, lower courts should examine all the evidence in the record to determine whether sufficient evidence supports the damage award, remitting only if some portion is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex.1986); *accord Larson v. Cactus Utility Co.*, 730 S.W.2d 640, 641 (Tex.1987). Courts of appeals should detail the relevant evidence, and if remitting, state clearly why the jury's finding is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pope*, 711 S.W.2d at 624, citing *Pool*, 715 S.W.2d 629. We conclude, therefore, that when "against the great weight and preponderance of the evidence" is the inquiry, then a "zero" issue as to damages is governed by *Pool*.

Pilkington fails to cite *Pool, Herbert, Cropper, Pope,* or *Larson.* Instead, Pilkington cites this court to authorities suggesting that the jury cannot award "zero" damages in a case such as the present case. We will not discuss those cases but will proceed to provide the analysis of all the evidence that must be weighed and considered in deciding whether the jury's findings are against the great weight and preponderance of the evidence. We know that the question in Pilkington's second point of error requires this court to consider and weigh all of the evidence in the case and to set aside the verdict and remand the cause for a new trial, if it thus concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust—this, regardless of whether the record contains some "evidence of probative force" in support of the verdict. *In re King's Estate*, 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951).

## WHAT THE JURY HEARD THAT PILKINGTON CONTENDS TO BE CONTRARY TO THE ZERO FINDINGS

On November 2, 1987, Pilkington was travelling east on Walnut Hill Lane, when she stopped for a red light behind another vehicle at the intersection of Preston Road. Kornell exited the Dallas North Tollway at Walnut Hill Lane and proceeded east towards Preston Road. Before Kornell reached the intersection, she fell asleep at the wheel. Kornell then crashed into the back of Pilkington's vehicle. Pilkington's vehicle was propelled into the vehicle in front of her and was "sandwiched" between the two vehicles. The force of the crash caused Pilkington's body to be thrown forward and recoil from the shoulder harness back into the seat, causing Pilkington to strike her head on the head rest. The shoulder harness that Pilkington was wearing stretched across her left shoulder. Immediately after the crash, Pilkington started crying because of severe pain in her head. The police investigated the accident and made a report, and Pilk-

ington's automobile was towed from the scene of the crash. After the collision, Pilkington was taken to a friend's house, where she rested for a couple of hours. Pilkington then returned to her home and immediately went to sleep for the night.

Prior to November 2, 1987, Pilkington had never experienced any problems with her neck, shoulder, arm, or lower back. Pilkington testified that since November 2, 1987, she had not been involved in any other automobile accident, nor had she fallen, nor had she experienced any other type of additional trauma to her neck, shoulder, arm, or lower back. The morning after the accident, Pilkington felt pain in her entire body. Pilkington made an appointment with Dr. Pamela Hendrickson. The doctor prescribed medication, physical therapy and a TENS unit. The doctor first identified weakness in Pilkington's left arm three days after the accident. On November 11, 1987, x-rays were taken of Pilkington's neck. These x-rays revealed a "reversal of the cervical lordosis," indicating "paraspinous muscle spasm."

At the time of the accident, Pilkington was attending school and working part-time. After the accident, Pilkington took a leave of absence from her studies at the Art Institute of Dallas and returned to her home town of Little Rock, Arkansas. Pilkington was unable to sit in an art classroom and perform the tasks of leaning and sitting at a drawing table because of the pain that she was experiencing. In addition, Pilkington was unable to do her homework or engage in recreational activities such as aerobics and tennis. Pilkington missed time from work and had to quit her job.

After moving to Little Rock, Pilkington was under the care of Dr. David Laga from November 23, 1987, through August 1988. Dr. Laga's report states that Pilkington had "chronic cervicobrachial syndrome" with "radicular neuralgias into the left shoulder and arm." In addition, Pilkington felt tingling and numbness in her left hand.

Between July 18, 1988, and October 20, 1988, Pilkington was under the care of Jerry L. Thomas, M.D. of Orthopedic Asso-

ciates in Little Rock, Arkansas. Dr. Thomas's report, dated November 3, 1988, indicates that x-rays of Pilkington's cervical spine "show continuous reversal of normal cervical curve." Dr. Thomas prescribed additional medication for Pilkington.

From October 6 to October 19, 1988, Pilkington was treated by Dr. Cole. Pilkington related to Dr. Cole that she experienced pain and numbness in her left shoulder and arm. Dr. Cole's report states: "Cervical film taken on 10-10-88 display a complete cervical curve reversal from the 2nd to the 7th cervical vertebrae...."

Subsequently, Pilkington was treated under the direction of neurosurgeon, Robert E. Abraham, M.D. Dr. Abraham's May 22, 1990, report states that "[t]here was also an EMG performed that showed abnormalities in the C5, C6, an [sic] C7." Dr. Abraham's report states: "Motor function: There was a decrease in the deltoids and biceps on the left.... Assessment: 1) Cervical and Lumbar Myofascial Pain[;] 2) Brachial Plexopathy." Dr. Abraham did additional x-rays on Pilkington's cervical spine that revealed "a severe hypolordosis of the cervical spine."

Pilkington was referred to a neurologist, Yvette A. Baker, M.D. Pilkington first saw Dr. Baker on October 12, 1989. Dr. Baker recorded Pilkington's medical history in her records. This history revealed that Pilkington had been involved in an automobile accident in November 1987, her car was hit from the rear, and she injured her head and shoulder. The history also revealed that Pilkington had been having occipital headaches, neck pain, and left shoulder pain with reduction in arm function since the date of the accident. As part of the history, Dr. Baker inquired as to Pilkington's occupation. Dr. Baker wanted to know how much Pilkington used her shoulder and how long she had to sit each day. Pilkington explained that she worked eight hours a day in a printing shop and had to use her shoulder and sit during the day. Dr. Baker testified, by deposition, that Pilkington had sustained an injury to her shoulder and that repetitive movement

of the shoulders would cause Pilkington pain.

On physical examination, Dr. Baker found spasms in Pilkington's neck, tenderness when she palpated Pilkington's left superclavicular muscles, and a decreased range of motion in the left shoulder. On neurological examination, Dr. Baker found that Pilkington had a left pronator drift. Dr. Baker testified that muscle spasms are sustained, involuntary contractions of a muscle and are painful. Dr. Baker also testified that spasms are caused by trauma. Dr. Baker testified that "generally when a muscle spasm doesn't go away with conservative therapy, you have to wonder if there's a herniated disk or something else causing the muscles to continuously spasm." In Dr. Baker's opinion, the "something else" causing Pilkington's muscle spasms was a glenoid labrum tear in her shoulder.

Dr. Baker ordered an EMG and an MRI scan of Pilkington's left shoulder. On June 6, 1990, the MRI scan revealed an injury to Pilkington's left shoulder. The radiologist's report states, in part: "IMPRESSION: Anterior glenoid labrum tear." Dr. Baker stated that in order to correct the glenoid labrum tear, Pilkington would need surgery and additional physical therapy. Dr. Baker testified that the cause of the deformities that were depicted in the MRI was trauma. Dr. Baker also testified that the only traumatic event that Pilkington experienced was the November 2, 1987, automobile accident. Dr. Baker opined that when Pilkington slammed against the shoulder harness, Pilkington received the glenoid labrum tear. Dr. Baker also stated that there was a relationship between the pain that Pilkington was experiencing and the loss of range of motion in her left shoulder. Dr. Baker testified that the pain was secondary to the brachial plexopathy that Pilkington experienced in her neck and left shoulder. Dr. Baker believed that Pilkington's nerves were compressed in the left shoulder capsule, which was the reason that Pilkington had a decreased range of motion. In addition, Dr. Baker testified that the brachial plexopathy would cause weakness, tingling, and pain in Pilkington's left arm. Dr. Baker opined that the weakness caused a pronator drift of Pilkington's left arm.

As part of the examination, Dr. Baker performed a vibration test with a tuning fork and a pinprick test. Dr. Baker stated: "Vibration was decreased on the left, as was pinprick. Pinprick, especially in the ulnar nerve distribution." Dr. Baker testified that a decrease in vibration shows a sensory deficit, which indicates nerve damage. Dr. Baker stated that a decrease in pinprick sensation also indicates nerve damage. Dr. Baker also performed an EMG on Pilkington. The EMG revealed a low amplitude in the ulnar nerve, which indicates compression of the nerves. Dr. Baker discovered that Pilkington suffered from an acute and chronic denervation at the C–5, C–6 and C–6, C–7 distributions. Dr. Baker testified that this means that the muscles at those levels "showed evidence of nerve damage or decrease nerve input to the muscles."

Dr. Baker stated that Pilkington will always have a limitation of movement in her neck and left shoulder. Dr. Baker indicated that there would be times of remission and times of exacerbation for Pilkington for a long time. Dr. Baker also stated that Pilkington's decreased ability to use her left arm is a permanent injury. In a report dated March 29, 1990, Dr. Baker stated:

> I feel at this time that [Pilkington's] disability is about 30–40%, and that she would have difficulty performing work requiring use of her left upper extremity, lifting heavy objects, etc.

Dr. Baker testified that there was a high correlation between the findings from the physical examinations and tests and Pilkington's subjective complaints of headaches and pain in her left shoulder, left arm, and neck.

After performing tests on Pilkington's neck, Dr. Baker found that Pilkington had a reduced range of motion in her neck that was caused by muscle spasms. Dr. Baker opined that Pilkington's occipital headaches and neck pain were also caused by muscle

spasms. Dr. Baker testified that a tearing of the muscle is often associated with muscle spasms and that when muscle tissue heals, it leaves scar tissue that causes decreased function in the muscle.

During her testimony, Dr. Baker was asked to look at x-rays of Pilkington's spine taken on November 11, 1987. Upon examination, Dr. Baker testified that these x-rays showed "a straightening or loss of lordosis of the cervical spine." Dr. Baker testified that Pilkington's loss of lordotic curve was due to spasms of the paraspinous muscles. Dr. Baker was asked to compare the November 11th x-rays with x-rays taken on June 12, 1990. Dr. Baker testified that both sets of x-rays showed a loss of the cervical lordotic curve.

Dr. Baker testified that Pilkington's neck strain and muscle spasms would adversely affect her ability to work at a drafting table. In Dr. Baker's opinion, Pilkington would have difficulty performing work as an art student because she is unable to fully rotate the shoulder and sit at the drafting table. Dr. Baker stated that Pilkington's injuries have adversely affected Pilkington's ability to earn money.

Dr. Baker testified that Pilkington was not a malingerer and that Pilkington was motivated to get rid of her pain. Dr. Baker stated: "[Pilkington has] always gone to the appointments and she seems to have done the things that she needs to do, as much as she knows, to get rid of the pain." In addition, Dr. Baker testified that unlike the profile of a malingerer, Pilkington has continued to work after the date of the accident. Dr. Baker testified that Pilkington's injuries were caused as a direct result of the November 2, 1987, collision.

## WHAT THE JURY HEARD THAT KORNELL CONTENDS SUPPORTS THE ZERO FINDINGS

On November 2, 1987, Kornell bumped into the back of Pilkington's vehicle at approximately fifteen miles per hour. Pilkington's vehicle was pushed into the vehicle in front of her; however, that vehicle was not damaged by the impact. Kornell was not injured in the collision, except for some bruises. Pilkington advised the police that she did not need an ambulance.

On November 3, 1987, Pilkington went to see Dr. Hendrickson, who noted "no signs of trauma" and "minimal distress." X-rays at this time showed a "slight reversal of the normal cervical lordosis, but this may be due to positioning." Dr. Hendrickson expected Pilkington to recover from the injuries within five to six days. Even Dr. Baker, who first saw Pilkington nearly two years after the accident, testified that Pilkington should have fully recovered within two or three weeks of the accident.

At the time of the accident, Pilkington was a first-year student at the Art Institute of Dallas and was employed part-time with St. Martin Trading. Pilkington completed that semester six weeks later and made good grades. Pilkington testified that no doctor told her that she could not go back to school or that she could not work. Pilkington obtained another job, working full-time, shortly after dropping out of school.

During the two and a half years following the accident, Pilkington went to approximately nineteen health care providers. The only objective indication of injury that any of the doctors could find for more than two years were muscle spasms. Dr. Norman Pledger, who saw Pilkington less than six months after the accident, noted nothing more significant than "possible impending litigation." Dr. Jerry Thomas treated Pilkington one year after the accident and indicated that "[s]he is very symptomatic from a subjective standpoint," but that her "MRI is normal" and "there is nothing to suggest spinal cord or nerve root problems on physical examination." Dr. Thomas also indicated that Pilkington's "healing period [has] ended."

The opinions of Dr. Baker were largely dependent upon a telephonic report that Dr. Baker received during her deposition, in which Dr. Baker was advised that Pilkington had "an anterior glenoric labrum tear." Dr. Baker used this new objective evidence of an injury as the basis of her opinions, even though she did not know what a "labrum" was. Dr. Baker also ad-

mitted that Pilkington's neurological examination was normal when she first examined Pilkington and that Pilkington's congenital scoliosis could be a contributing factor of the pain. When questioned about Pilkington's future pain and suffering, Dr. Baker admitted that it is "harder to tell" about future pain. Dr. Baker admitted that some factors that contribute to Pilkington's pain are the normal stresses of everyday living and the stress of filing this lawsuit. Dr. Baker testified that the resolution of the lawsuit would "significantly decrease" Pilkington's complaints of pain, if the stress is anxiety induced. Dr. Baker based her testimony in large part on the medical history given by Pilkington. Thus, she concluded that the glenoid labrum tear was caused by the automobile accident largely because Pilkington did not tell her about any other traumatic event. Dr. Baker further stated that the recovery period for this type of injury is usually within two or three weeks after the accident.

Several of Pilkington's physicians prescribed medication in the form of painkillers and muscle relaxers. Pilkington initially stated that she was making a claim for these medications, but then she explained that "[i]f they made me drowsy I wouldn't take them." When confronted with the fact that she had refilled a prescription, Pilkington explained that she only took the medication at night and that "it was a low dosage." Pilkington was then asked why she would complain that the medication made her drowsy if she only took it at night, and she answered that she did not want to be sleepy during the day.

As to the issue of lost wages, Martin Fishman testified that Pilkington might have been making as much as $22,000.00 if she were still working for him at the time of trial, but Fishman also admitted that Pilkington did not need a degree from an art school to work for him. Pilkington insisted that dropping out of school had cost her lost wages, even though she made more money after dropping out of school. Pilkington claimed a loss of $6,782.00, but she forgot to mention one of the jobs she had held. Pilkington admitted that not one of her many physicians had advised her that she could not return to work or to school.

## DISPOSITION

Before proceeding to a discussion of the issue before us, we observe the alternatives available to the jury when presented with conflicting evidence. The trier of fact has several alternatives available when presented with conflicting evidence. It may believe one witness and disbelieve others. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986). The trier of fact may resolve inconsistencies in the testimony of any witness. *McGalliard*, 722 S.W.2d at 697. As a general rule, it is peculiarly within the province of the jury to weigh opinion evidence and the judgment of experts. *Octane Oil Refining Co. v. Blankenship–Antilley Implement Co.*, 117 S.W.2d 885, 886 (Tex.Civ. App.—Eastland 1938, no writ). It is within the province of the jury to decide which expert witness should be credited. *American Airlines, Inc. v. United States*, 418 F.2d 180, 194 (5th Cir.1969). Applying these principles, we conclude that the jury in the present case could believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness. Indeed, the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Leyva v. Pacheco*, 163 Tex. 638, 358 S.W.2d 547, 549 (1962).

Given the alternatives available to the jury in the present case when presented with conflicting evidence, we are mindful that the jury was not convinced by a preponderance of the evidence to award compensation for past and future (1) pain, suffering, and mental anguish, (2) lost earning capacity, or (3) physical impairment. *See Herbert*, 754 S.W.2d at 144. Indeed, considering all the evidence, we conclude that the evidence is factually sufficient to support the jury's findings. Considering and weighing all the evidence, we are unable to state in what regard the contrary evidence greatly outweighs the evidence in support of the jury's findings. *See Pool*, 715 S.W.2d at 635. In the present case, there-

fore, we cannot hold that the jury's findings are factually insufficient. Moreover, we cannot hold that the jury's findings are so against the great weight and preponderance of the evidence as to be manifestly unjust, that the jury's findings shock the conscience of this court, or that the jury's findings clearly demonstrate bias. *See Pool,* 715 S.W.2d at 635. Indeed, we conclude that to so hold in the present case would abuse our authority under article V, section six of the Constitution of the State of Texas and deprive Kornell of her right of trial by jury afforded her by article I, section fifteen of the Texas Constitution. In short, we cannot agree to "unfind" the jury's findings and substitute our judgment for that of the jury. We hold, therefore, that the evidence is factually sufficient to support the jury's findings. Moreover, we conclude that the jury's findings of "zero" in response to questions of damages for past and future physical pain, mental anguish, loss of earning capacity and physical impairment are not so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. We overrule Pilkington's second and third points of error.

Affirmed.