TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-99-00355-CV







Tammy VandeStreek; Tim VandeStreek; and Claude Ducloux, as Guardian Ad Litem for
Courtney VandeStreek, a Minor, Appellants


v.



Jo Bess Hammer, M.D., Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT


NO. 97-06257, HONORABLE MARY PEARL WILLIAMS, JUDGE PRESIDING








 We consider in this appeal whether the evidence shows that appellee Jo Bess
Hammer, M.D., violated the standard of care required of a doctor delivering an infant when a
shoulder dystocia has occurred. Because Courtney VandeStreek sustained a brachial plexus injury
during her delivery, her parents Tammy VandeStreek and Tim VandeStreek and her guardian ad
litem Claude Ducloux sued Dr. Hammer for medical malpractice. Following trial to a jury, the
jury failed to find that Dr. Hammer was negligent. The trial court rendered judgment on the
verdict for Dr. Hammer. We affirm the trial court's judgment.

 In a single issue on appeal, the VandeStreeks contend that they established by the
great weight and preponderance of the evidence that Dr. Hammer failed to follow the standard of
care required for delivering a baby when a shoulder dystocia has occurred. After the evidence
was presented at trial, the jury was asked: "Was the negligence, if any, of Dr. Hammer a
proximate cause of the brachial plexus injury to Courtney VandeStreek?" The jury answered,
"No."

 To review the evidence under a challenge that the verdict is against the great weight
and preponderance of the evidence, we consider all the evidence and will set aside the verdict only
if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. 
Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); In re King's Estate, 244 S.W.2d 660, 661 (Tex.
1951). A jury's failure to find a fact need not be supported by affirmative evidence, but the jury
cannot refuse to find a fact in the face of overwhelming evidence of its existence. Russell v.
Hankerson, 771 S.W.2d 650, 653 (Tex. App.--Corpus Christi 1989, writ denied). The jury's
failure to find for the VandeStreeks here means, not that they affirmatively found the converse,
but simply that the VandeStreeks failed to carry their burden to convince the jury, by a
preponderance of the evidence, that the fact of negligence existed. Gensco, Inc. v. Canco Equip.,
Inc., 737 S.W.2d 345, 347-48 (Tex. App.--Amarillo 1987, no writ).

 The trial court instructed the jury that ordinary care means the degree of care that
an obstetrician of ordinary prudence would use under the same or similar circumstances. The
court also instructed the jury, in accordance with Texas law, that


[a] finding of negligence may not be based solely on evidence of a bad result to the
patient in question, but such a bad result may be considered by you, along with
other evidence, in determining the issue of negligence.


See Tex. Rev. Civ. Stat. Ann. art. 4590i, § 7.02(a) (West Supp. 2000).

 During the birth process, after Courtney's head was delivered, her top or anterior
shoulder lodged behind the mother's pubic bone, preventing the rest of Courtney's body from
being delivered. A delivery complicated by a shoulder impacted in this way is known as a
shoulder dystocia. Among her efforts to free the shoulder, Dr. Hammer applied traction to, or
pulled on, Courtney's head. Courtney was born with a brachial plexus injury involving her left
shoulder and arm. (1) Dr. Hammer testified that her pulling on the head while the shoulder was
impacted behind the pubic bone damaged Courtney's shoulder. The traction tore the muscle,
fascia or membranes that help protect the muscle, and three cervical nerves that go to the deltoid,
biceps, and triceps muscles. Although two surgeries have repaired some of the damage, Dr.
Laurent, Courtney's neurosurgeon, believed that Courtney's left shoulder and arm will remain
smaller than normal, that she will have weakness in her left arm and fewer fine motor skills in her
left arm and hand, and that shoulder pain and scoliosis may develop.

 Five doctors, including Dr. Hammer, testified at trial. Dr. James O'Leary has had
a practice primarily at teaching hospitals, teaching medical students, interns, and residents. He
is certified in obstetrics and gynecology by the American College of Obstetricians and
Gynecologists and has focused on complicated and high-risk obstetrics. He has also maintained
a small clinical practice and has published extensively in the field of obstetrics. Dr. John Laurent
is the pediatric neurosurgeon who has performed two surgeries on Courtney. He is the chief of
neurosurgery at Texas Children's Hospital and co-chief of the brachial plexus clinic within that
hospital. Dr. Bruce Halbridge maintains a general obstetrics and gynecology practice in Houston
with an emphasis on high-risk pregnancies. He is certified by the American College of
Obstetricians and Gynecologists and has delivered many thousands of babies, including several
hundred with shoulder dystocias. Dr. George Hilliard is an obstetrician/gynecologist practicing
in San Antonio. He has spent much of his career teaching residents obstetrics and gynecology in
the United States Air Force, and has also had an active clinical practice in which he delivers about
300 babies a year, involving 9000 to 10,000 deliveries throughout his career. Finally, Dr.
Hammer has practiced in Austin as an obstetrician/gynecologist since 1980. She is certified by
the American College of Obstetrics and Gynecology, has assumed positions of leadership at the
hospital where she is admitted to practice, and has delivered about 4000 babies during her career.

 The witnesses agreed that a shoulder dystocia presents a medical emergency that
is potentially life threatening because the baby's umbilical cord can be compressed against the
vaginal wall, decreasing the blood flow through the cord. The doctor must deliver the baby
within about four minutes to avoid the risk of injuring the baby's brain from the lack of oxygen. 
Dr. Hilliard testified further that, because the doctor does not know the baby's internal status once
the head has been delivered, it is not recommended that the doctor necessarily take a full four
minutes to free the shoulder and deliver the baby. He stated that not knowing the baby's status
requires the doctor to use her judgment and that this was a case requiring judgment as to whether
to deliver the baby to prevent other kinds of injuries and loss of life. About two minutes elapsed
in this case between the time Courtney's head was delivered and full delivery was accomplished.

 No dispute exists among the witnesses that, to begin treatment of a shoulder
dystocia, a doctor who uses the McRoberts position, suprapubic pressure, and gentle traction
meets the standard of care. To use the McRoberts position, the mother's knees are pushed up
against the abdomen to open up the pelvic bones and rotate the pubic bone, freeing the impacted
shoulder in some instances. Suprapubic pressure is applied by a nurse who pushes down on the
pubic bone where the baby's shoulder is caught to help dislodge it. Dr. O'Leary testified that
while the mother is in the McRoberts position and suprapubic pressure is being applied, the doctor
has her hands on the baby's head and exerts the amount of traction normally used to deliver a
baby. Employing the McRoberts position, suprapubic pressure, and traction together, according
to Dr. O'Leary, relieves about eighty percent of shoulder dystocia cases. Dr. O'Leary also stated
that performing an episiotomy, an incision in the vulva to allow more room, is an essential part
of treating a shoulder dystocia.

 During the delivery in this case, Courtney's upper shoulder lodged against the
pubic bone during the descent of the head, and once the head appeared, Dr. Hammer noticed the
shoulder dystocia. Dr. Hammer testified that she immediately performed a complete episiotomy
to give the most room possible. All witnesses except Dr. Halbridge testified that Dr. Hammer
had Mrs. VandeStreek placed in the full McRoberts position, with her knees back to her chest. 
Dr. Halbridge could not be sure from his review of the case that Mrs. VandeStreek's legs were
pulled back far enough to help her deliver the baby without damage. Dr. Hammer testified
without contradiction that a nurse applied suprapubic pressure with the palm of her hand.

 The amount of traction to be used while treating a shoulder dystocia was a
significant issue at trial. Dr. O'Leary described the amount of traction as gentle, downward
traction, the same amount of traction the doctor routinely uses to deliver babies. He stated that,
although it should never be strong, the doctor's hands-on experience with the baby allows her to
know how much traction to use. Dr. O'Leary testified that rather than using strong traction, the
doctor should try other maneuvers. While he warned against using strong traction, Dr. O'Leary
agreed that in some situations a greater force than that ordinarily given might be necessary to
correct a shoulder dystocia. Dr. Halbridge testified that traction that tears nerves and muscle is
never justified. He believed that a doctor delivering a child should use only gentle traction. Dr.
Hammer testified that because shoulder dystocia is an emergency, a doctor might at times use
more than the gentle pressure used at the beginning of delivery. She also stated that when
suprapubic pressure is applied, the doctor must apply some amount of traction to guide the
shoulder forward; she agreed with the statement that the traction in this circumstance should be
gentle. Dr. Hilliard testified that a doctor who has delivered thousands of babies has a feel for
the right amount of traction for a particular situation and that that amount is unquantifiable. He
testified that using the McRoberts position and suprapubic pressure will often require the doctor
to place some traction on the baby's head. Dr. O'Leary referred to a study in which Drs. Allen
and Gonik tried to measure the amount of traction exerted during various deliveries; they found
that in a difficult delivery, almost twice as much traction is used as during a normal delivery. 
When the shoulder is stuck, three to four times the normal amount of traction is exerted. Dr.
Hilliard stated that a layperson who observes a delivery, and who may have seen one or two
deliveries before that, cannot know what traction a doctor routinely uses to deliver a baby and
cannot tell whether a doctor is applying too much traction at any one time.

 Mrs. VandeStreek's mother Sharon Ross testified that during the delivery Dr.
Hammer pulled on the baby's head as hard as she could. Shelly Ross, one of Mrs. VandeStreek's 
sisters, described Dr. Hammer as pulling Courtney's head very hard, like it was a stuck
doorknob. Shelly testified that Dr. Hammer pulled more than once, at least three times. Kelly
Ross, Shelly's twin, also testified that Dr. Hammer pulled Courtney's head more than once. She
stated that Dr. Hammer pulled so hard that it seemed as if Courtney's neck was stretching. Dr.
Hammer testified that she applied downward traction on the baby's head to deliver it. She did not
think that she was using so much traction that she was causing any injury to Courtney.

 The witnesses agreed that the effects of traction on a baby during delivery are not
uniform. Dr. O'Leary recognized that in a rare case a child can sustain a permanent brachial
plexus injury even though the doctor applies the normal amount of traction. Dr. Laurent testified
that each child is different, and that the amount of traction that will tear one child's nerves might
not tear another child's. Dr. Hammer disagreed at trial that, according to the medical literature,
normal, gentle traction will not injure a brachial plexus. Dr. Hilliard agreed that a normal amount
of traction that would cause no injury in one baby might permanently injure another, and stated
that it is impossible to know in advance whether the amount of traction that would not injure one
child would injure another. Dr. Hilliard cited a study in which babies were controlled for weight, 
whether the mother had borne previous children, labor course, and pressure during delivery;
despite the controls, some babies were injured during delivery and some were not. Dr. Hilliard
believed that doctors' clinical experience bore out the study's results: despite appearing similar
each baby is different, such that the traction that works for one would not work for another, and
under seemingly identical circumstances, one baby will have injuries and another will not.

 Testimony was also given on the action that should be taken if the McRoberts
position with suprapubic pressure and gentle traction fail. Dr. O'Leary testified that if these
techniques do not deliver the baby, the doctor should stop pulling and try other maneuvers before
applying additional traction. To continue pulling on the baby if the McRoberts position and
suprapubic pressure fail to free the shoulder would be below the standard of care. The witnesses
described a number of maneuvers that can be used to help release the shoulder. In one, the doctor
reaches her hand into the vagina toward the pubic bone and pushes the baby's anterior or top
shoulder off to the side so that it comes out. In the Woods maneuver, the doctor puts her hand
behind the posterior or bottom shoulder and rotates it progressively 180 degrees in a corkscrew
manner so as to release the impacted shoulder. A third maneuver, delivery of the posterior
shoulder, requires the doctor to sweep the baby's posterior arm across the chest, then to deliver
the arm and finally the impacted shoulder.

 Dr. O'Leary stated that the order in which these maneuvers are used is not fixed,
but depends on the doctor's preferences and judgment. Dr. Halbridge testified that if using the
McRoberts position and suprapubic pressure with gentle traction do not deliver the baby, he never
adds additional traction until the shoulder is released. Dr. Halbridge stated that an obstetrician
delivering a baby violates the standard of care by applying additional traction when the shoulder
is still impacted behind the pubic bone. Dr. Hilliard agreed that, if additional meant excessive
or more than normal traction, then no additional traction should be used. He stated that although
a doctor would not use more traction than normally used to deliver a baby, the doctor might come
back repeatedly to using normal traction. Dr. Hilliard stated that during the minutes available to
treat a shoulder dystocia, the doctor is constantly trying and retrying maneuvers, repeating some
that did not work the first time. Dr. Hilliard stated that no protocol of maneuvers can replace
good clinical judgment. Although eschewing a standard order of procedures, if the McRoberts
position with suprapubic pressure and gentle, downward traction failed, Dr. Hilliard would
himself try another maneuver to release the shoulder before applying additional traction.

 Mrs. VandeStreek's sister Kelly had testified at her deposition that after the
episiotomy she saw Dr. Hammer insert her fingers into the vagina to help the delivery. Dr.
Hammer testified that, although she had not initially remembered it, the deposition testimony of
Kelly helped her remember that she inserted her fingers into the vagina posteriorly or behind the
baby. At trial, however, Kelly stated that at no time after the episiotomy did she see Dr. Hammer
insert her hand to try to deliver the posterior arm. Sharon Ross and Shelly also denied seeing Dr.
Hammer insert her fingers into the vagina to attempt to free the impacted shoulder. Dr.
O'Leary's perception from watching the videotape of the delivery was that Dr. Hammer's hands
remained on Courtney's head while she was treating the shoulder dystocia. Dr. Hammer testified
that sweeping her fingers in the vagina would mean that she was going behind the posterior
shoulder to try to move the arm up to deliver that shoulder. The attempt to deliver the posterior
shoulder did not work.

 Dr. Hammer testified that by using the McRoberts position with suprapubic
pressure and downward traction, she was able to deliver the baby. The purpose of giving
downward traction was to dislodge the shoulder from behind the pubic bone. Because these
procedures delivered the baby, Dr. Hammer did not proceed to other maneuvers such as rotating
the shoulder.

 Dr. O'Leary agreed that brachial plexus injury can occur even though a doctor
applies appropriate obstetric maneuvers. Similarly, Dr. Laurent testified that brachial plexus
injuries can occur without negligence on the doctor's part. Dr. Halbridge stated, to the contrary,
that based on his studies and experience a permanent brachial plexus injury caused by a shoulder
dystocia has never occurred absent negligence by the doctor.

 Dr. Laurent testified that the damage to Courtney's muscles and nerves was caused
by severe lateral traction to the neck at the time of birth, but formed no opinion as to whether Dr.
Hammer did anything inappropriate during the delivery. Dr. O'Leary testified that after gentle
traction, used with the McRoberts procedure and suprapubic pressure, failed to free the shoulder,
Dr. Hammer should have stopped what she was doing and used some of the other maneuvers. 
He believed that Dr. Hammer used undue force to deliver Courtney. Dr. Hilliard stated that from
his review of the medical records in this case, Dr. Hammer did what any reasonable physician
would do to deliver a baby with a shoulder dystocia and that she did not deviate from the standard
of care.

 The jury in this case heard a range of testimony concerning the appropriate methods
for treating a shoulder dystocia and the actions Dr. Hammer took during Courtney's delivery. 
When the evidence conflicts, the jury can choose to believe one witness and disbelieve others or
resolve inconsistencies in their testimony. McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex.
1986). It is within the province of the jury to weigh expert opinion testimony and to determine
which expert witness should be credited. Pilkington v. Kornell, 822 S.W.2d 223, 230 (Tex.
App.--Dallas 1991, writ denied). On this record, the jury could have found that some amount of
traction was necessary to release the shoulder and that Dr. Hammer, using her experience in
delivering 4000 babies, applied a proper amount of traction to deliver Courtney. That Courtney
sustained injuries as a result does not alone determine that Dr. Hammer violated the standard of
care. See art. 4590i, § 7.02(a). Because the jury's failure to find that Dr. Hammer violated the
standard of care is not against the great weight and preponderance of the evidence, we overrule
the VandeStreeks' issue.

 We affirm the trial court's judgment.



 


 Jan P. Patterson, Justice

Before Justices Jones, Yeakel and Patterson

Affirmed

Filed: July 13, 2000

Do Not Publish
1. The brachial plexus is made up of nerves that go to the arm and the hand.



oulder before applying additional traction.

 Mrs. VandeStreek's sister Kelly had testified at her deposition that after the
episiotomy she saw Dr. Hammer insert her fingers into the vagina to help the delivery. Dr.
Hammer testified that, although she had not initially remembered it, the deposition testimony of
Kelly helped her remember that she inserted her fingers into the vagina posteriorly or behind the
baby. At trial, however, Kelly stated that at no time after the episiotomy did she see Dr. Hammer
insert her hand to try to deliver the posterior arm. Sharon Ross and Shelly also denied seeing Dr.
Hammer insert her fingers into the vagina to attempt to free the impacted shoulder. Dr.
O'Leary's perception from watching the videotape of the delivery was that Dr. Hammer's hands
remained on Courtney's head while she was treating the shoulder dystocia. Dr. Hammer testified
that sweeping her fingers in the vagina would mean that she was going behind the posterior
shoulder to try to move the arm up to deliver that shoulder. The attempt to deliver the posterior
shoulder did not work.

 Dr. Hammer testified that by using the McRoberts position with suprapubic
pressure and downward traction, she was able to deliver the baby. The purpose of giving
downward traction was to dislodge the shoulder from behind the pubic bone. Because these
procedures delivered the baby, Dr. Hammer did not proceed to other maneuvers such as rotating
the shoulder.

 Dr. O'Leary agreed that brachial plexus injury can occur even though a doctor
applies appropriate obstetric maneuvers.