**PRINCIPAL LIFE INSURANCE CO., Appellant,**

v.

**REVALEN DEVELOPMENT, LLC, Appellee.**

No. 05–10–00680–CV.

Court of Appeals of Texas, Dallas.

Jan. 23, 2012.

David M. O'Dens, Dallas, TX, for Appellant.

Ernest Walter Leonard, Friedman & Feiger, L.L.P., for Appellee.

Before Justices MORRIS, O'NEILL, and FILLMORE.

## OPINION

Opinion by Justice O'NEILL.

Appellee Revalen Development, LLC sued appellant Principal Life for breach of contract after Principal Life refused to sell it certain property. The trial court, following a bench trial, found in favor of Revalen and awarded it $2.49 million. In four points of error, Principal Life con-

tends (1) the evidence is legally and factually insufficient to prove a valid contract was formed, (2) any alleged oral contract would violate the statute of frauds, (3) Revalen did not prove it could have performed its obligations under the contract, and (4) Revalen did not prove its damages with reasonable certainly. For the following reasons, we reverse the trial court's judgment and render judgment that Revalen take nothing.

This case concerns the alleged breach of an oral contract for the sale of a note that was secured by commercial real estate—a shopping center in Addison, Texas. The note matured on June 1, 2009 and the borrower defaulted. The face value of the note was $16.8 million and the value of the real property was $19.1 million. After the borrower defaulted, Principal Life, the holder of the note, attempted to negotiate with the borrower to refinance. Its initial attempts were unsuccessful. As a consequence, Principal Life posted the property for foreclosure. Principal Life also began marketing the note, preferring to sell the note at a discount over foreclosing. Michael Logsdon, asset manager of special servicing for an affiliate of Principal Life, began seeking bids on the note.

Paul Cheng of Cheng Investments heard of the opportunity to purchase the note at a discount and contacted Logsdon. Cheng asked Logsdon for Principal Life's form contract and also asked about financing through Principal Life on the note. Logsdon informed Cheng that Principal Life would not finance the note, but sent him its shell Purchase and Sale Agreement (PSA). When Cheng received the shell PSA, he forwarded it to his attorney and sought financing. His friend and business associate, Oscar Renda, told Cheng he would personally finance the deal.

Renda testified he agreed to put up $14.3 million in cash to purchase the property. Renda testified he thought he was purchasing a shopping center and could not recall whether they discussed purchasing a note. He said he would have done the transaction even if they were obtaining the property by foreclosing on a note. Although his commitment to do the deal was "very firm," he testified that he would have required a written partnership agreement with Cheng as well as a written PSA.

Cheng told Logsdon he had financing and was interested in purchasing the note. Because Principal Life required sales in excess of $10 million be approved by its Investment Committee before such a contract could be authorized, Logsdon and Cheng discussed the terms of a proposal that would be presented to the Committee. Ultimately, Cheng and Logsdon agreed Logsdon would present a proposed purchase price of $14.3 million. The proposal also included a closing date of July 30, 2009 and an option to extend closing until August 15th for a nonrefundable deposit of $200,000. Logsdon told Cheng he would present the proposal to the Investment Committee.

On July 16, 2009, the proposal was presented to Principal Life's "Real Estate Committee," which recommended the Investment Committee approve the transaction. That day, Logsdon called Cheng. This phone call is at the heart of Revalen's case. Cheng testified that Logsdon told him, "Congratulations, the Investment Committee has approved the proposed purchase of the note by you."[1] Cheng testified he responded, "I agree to it. I have no problems with it. I accept it." Cheng acknowledged he and Principal Life both contemplated a written PSA would

---

1. Cheng testified he was sure Logsdon said Investment Committee. Regardless, the following day the Investment Committee approved the proposal.

ultimately be signed and specifically testified that Logsdon "required" or "asked for" a written PSA. Regardless, he asserts a binding oral contract was nevertheless formed at that moment.

The following day, Cheng sent Logsdon the original shell PSA and his redline version of the PSA. The redline contained numerous provisions that the parties had not yet discussed or agreed upon and altered some of the terms that the parties had agreed on. The "redline" contract, changed the buyer from Cheng Investments to Revalen Development, a limited liability company. Cheng explained "Cheng Investments" is a d/b/a of himself "and all of my companies." The redline also changed the purchase price from $14.3 million to $14.299 million. The redline changed the earnest money amount from 5% of the purchase price to $100. The redline also gave Revalen the option to extend closing to August 24. The redline struck out a liquidated damages provision that would have limited Cheng's damages to $25,000 if Principal Life had wrongfully terminated the contract. Finally, the redline gave Revalen the unilateral right to terminate the contract during the due diligence period. Logsdon sent the red line to Principal Life's legal department to review.

Meanwhile, the defaulting borrower agreed to renew negotiations to refinance the note. Ultimately, Principal Life and the borrower agreed to refinance and the note was no longer for sale. When Cheng discovered Principal Life was not going to sell the note, Revalen filed suit alleging breach of an oral contract. After hearing the evidence, the trial court entered a judgment in favor of Revalen. This appeal followed.

In its first issue, Principal Life contends the evidence is legally and factually insufficient to support the judgment because there was no evidence of an offer, acceptance, or a meeting of the minds on the essential terms of the agreement. Rather, it asserts the evidence showed only continued negotiations of a deal that was to be consummated only by a formal written contract. According to Principal Life, the Investment Committee approval of the proposed transaction meant only Cheng and Principal Life were authorized to move forward with negotiating the written PSA. Logsdon's communication of that approval did not transform the approval into an offer to enter into an oral contract.

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Thornton v. Dobbs*, 355 S.W.3d 312, 315–16 (Tex. App.-Dallas 2011, no pet.); *Pulley v. Milberger*, 198 S.W.3d 418, 426 (Tex.App.-Dallas 2006, pet. denied). Therefore, we review a trial court's findings of fact under the same sufficiency standards we use when determining if sufficient evidence exists to support an answer to a jury question. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994); *Thornton*, 355 S.W.3d at 315–16. In reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict, disregarding all contrary evidence that a reasonable factfinder could have reasonably disbelieved. *AutoZone Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex.2008) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005)). While we view the evidence in the light most favorable to the findings, we cannot consider the evidence in isolation divorced from its surroundings. *Id.* Rather, we review the evidence in its proper context with other evidence. *Id.*

To prove contract formation a party must prove, among other elements, an offer and acceptance and a meeting of the minds on all essential elements. *See Thornton*, 355 S.W.3d at 316; *Cessna Air-*

*craft Co. v. Aircraft Network, L.L.C.,* 213 S.W.3d 455, 465 (Tex.App.-Dallas 2006, pet. denied). For there to be an offer which may ripen into a contract by simple acceptance, the offer must be reasonably definite in its terms and must sufficiently cover the essentials of the proposed transaction that, with an expression of assent, there will be a complete and definite agreement on all essential details. *Edmunds v. Houston Lighting & Power, Co.,* 472 S.W.2d 797, 798–99 (Tex.App.-Houston [14th Dist.] 1971, writ ref'd n.r.e). The term "meeting of the minds" refers to the parties mutual understanding and assent to the expression of their agreement. *Weynand v. Weynand,* 990 S.W.2d 843, 846 (Tex.App.-Dallas 1999, pet. denied). To create an enforceable contract, the minds of the parties must meet with respect to the subject matter of the agreement and all its essential terms. *Id.* The parties must agree to the same thing, in the same sense, at the same time. *Id.*

■■■ If parties negotiating a contract intend that the contract shall be reduced to writing and signed by the parties before it is binding, either party may withdraw at any time before a written agreement is executed. *Gasmark, Ltd. v. Kimball Energy Corp.,* 868 S.W.2d 925, 929 (Tex.App.-Fort Worth 1994, no writ.). However, that parties intend for an informal agreement to be reduced to a more formal writing will not necessarily prevent present, binding obligations from arising. *Scott v. Ingle Bros. Pac., Inc.,* 489 S.W.2d 554, 556 (Tex. 1972); *Murphy v. Seabarge, Ltd.,* 868 S.W.2d 929, 933 (Tex.App.-Houston [14th Dist.] 1994, writ denied). If the parties have definitely agreed to undertake certain obligations, they have concluded the contract, even though the contemplated formal writing is never drawn up and executed. *Scott,* 489 S.W.2d at 556; Restatement (Second) of Contracts § 27 (1981).

Depending on the circumstances, though, such informal writings may also demonstrate that the parties have simply engaged in preliminary negotiations, in which case, there is no binding agreement. *Scott,* 489 S.W.2d at 556; Restatement (Second) of Contracts § 27 (1981).

■■■ The ultimate issue is the intent of the parties. *Victoria Air Conditioning, Inc. v. Lebco Constructors, Inc.,* 752 S.W.2d 625, 627 (Tex.App.-Corpus Christi 1988, writ denied). Some factors that have been considered in determining whether contracting parties intended to be bound by an informal agreement prior to the execution of a formal writing include (1) whether the contract is of that class usually found to be in writing, (2) whether the contract is of such a nature to need a formal writing for its full expression, (3) whether the contract has few or many details, (4) whether the amount involved is large or small, (5) whether it is a common or unusual contract, and (6) whether negotiations themselves indicate that a written draft is contemplated as a final conclusion of negotiations. *See Gilbert v. Texas Co.,* 218 S.W.2d 906, 942 (Tex.App.-Beaumont 1949, writ ref'd, n.r.e).

■■■ In this appeal, Principal Life contends (1) the evidence is insufficient to prove a meeting of minds as to all essential terms, and (2) the evidence is insufficient to prove the parties intended to be bound in the absence of a signed written contract. The only trial court finding to support an offer was the July 16th phone call in which Logsdon notified Cheng that Principal Life's "Committee" had "approved his proposed purchase" of the note and outlined the general terms that were presented to the Committee. We cannot agree a communication of an internal approval process, under the circumstances in which it was made, clearly communicated an offer that Cheng could accept. Initially, the precise

language used did not clearly communicate an offer. Nor did the context in which the phone call was made suggest it was intended to communicate a binding offer such that an acceptance would conclude formation of an oral contract. To the contrary, the only evidence in the record concerning the approval process shows it was an internal preliminary step in contract formation that applied only to larger business deals. The only reasonable conclusion from the context of the phone call was that Logsdon was informing Cheng that Principal Life's employees were authorized to enter into a contract on the terms presented. It is not unusual that parties to a complex transaction may need to reach a preliminary agreement in order to proceed toward execution of a final agreement. *See WTG Gas Processing, L.P. v. ConocoPhillips Co.,* 309 S.W.3d 635, 648 (Tex.App.-Houston [14th Dist.] 2010, pet. denied).

Nor do other circumstances surrounding the phone call support a conclusion that a binding legal offer to enter an oral contract was intended to be communicated. To the contrary, all surrounding circumstances suggest the parties intended to be bound only with a formal written agreement. At the time of the phone call, both Principal Life and Cheng were aware that Cheng's counsel was reviewing Principal Life's written shell PSA, making modifications on provisions that had yet to be discussed but were clearly contemplated. Indeed, the parties had yet to even determine what Cheng entity would enter the contract. Other provisions that had yet to be determined included termination provisions, due diligence periods, earnest money, and liquidated damage provisions. Revalen asserts these terms could not have been material because they were not discussed. But Revalen ignores the undisputed facts that these terms were included in the shell PSA, in his redline, and that all the parties were aware that these details would ultimately need to be determined in a written contract. That they had yet to reach this phase of the negotiations does not suggest the terms were not material. Finally, Revalen's argument that they would have ultimately agreed upon the terms if Principal Life had not renegotiated with the borrower is not relevant to whether the terms were material.

Our conclusion that no oral contract was formed with the July 16th phone call is reinforced by the subsequent actions of both Cheng and Principal Life. The day after the phone call, Cheng sent the redline of the written PSA to Principal Life. While the redline may be irrelevant if an oral agreement was previously reached, it is nevertheless highly relevant in determining whether the parties believed they were already contractually bound. The redline included numerous material details that had yet to be agreed on and in particular gave Revalen the unilateral right to terminate its obligations under the contract. Cheng admitted the termination provision was material. And under the circumstances, one would expect Cheng to insist on a manner of terminating the contract in light of the fact Cheng was binding himself to purchase the note for over $16 million in cash which he did not have. While he may have had a "firm commitment" from Renda to finance, it was not yet legally binding. Indeed, Renda did not even know he was purchasing a note and admitted that he would not finance without a written partnership agreement or a written PSA. Principal Life's conduct in continuing negotiations with the borrower, also shows that it was operating under the assumption no binding contract had yet to be formed. Revalen had the burden to prove it had formed a valid contract with Principal Life. Reviewing all the evidence, we cannot conclude there is even a scintilla of probative evidence that the parties

formed a valid contract with Principal Life. We sustain Principal Life's first issue. Given this disposition, we need not address Principal Life's remaining issues. We reverse the trial court's judgment and render judgment that Revalen take-nothing on its claim.

