**Reversed and Rendered in Part, Affirmed in Part and Opinion Filed May 22, 2013**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-11-01257-CV

**RONNIE AND TAMMY LANIER, Appellants**

**V.**

**EASTERN FOUNDATIONS, INC., DAVID ALLEN BEAVERS, & CHOICE DRIVERS, Appellees**

———————

**NATIONAL LIABILITY AND FIRE INSURANCE COMPANY, Appellant**

**V.**

**RONNIE AND TAMMY LANIER, EASTERN FOUNDATIONS, INC., DAVID ALLEN BEAVERS, & CHOICE DRIVERS, AND GENERAL INSURANCE COMPANY OF AMERICA, Appellees**

On Appeal from the County Court at Law No. 2
Dallas County, Texas
Trial Court Cause No. CC-09-00185-B

## OPINION

Before Justices Francis, Lang, and Evans
Opinion by Justice Francis

Ronnie and Tammy Lanier were injured in an on-the-job accident when a dump truck hit their tractor-trailer. The Laniers sued the driver, David Allen Beavers; Beavers's employer, Choice Drivers; and the company Beavers was driving for, Eastern Foundations, Inc. A jury returned a verdict in the Laniers' favor, awarding $131,000 in past damages to Ronnie and $38,550 in past damages to Tammy. The jury, however, awarded "zero damages" for Ronnie's

future pain and mental anguish, medical expenses, physical impairment, and loss of earning capacity and Tammy's derivative claims for past and future loss of consortium and loss of household services. The trial court rendered judgment on the jury's verdict, ordered the award to Ronnie be awarded to National Liability and Fire Insurance Company, the worker's compensation carrier for the Laniers' employer, and then be apportioned "in its entirety" to Ronnie's counsel. The Laniers and National separately appealed.

In two issues, the Laniers argue the jury's "zero damage" findings are against the great weight and preponderance of the evidence. In a third issue, they assert their medical expenses were not presented to the jury in compliance with *Haygood v. De Escabedo*, 356 S.W.3d 390 (Tex. 2011). In its appeal, National brings five issues related to its workers' compensation lien. We sustain National's fourth issue related to trial court error in reducing National's subrogation lien by the amount of the Laniers' litigation expenses and reverse that portion of the trial court's judgment. We affirm the judgment in all other respects.

We begin with the Laniers' appeal. The Laniers were husband-and-wife truck drivers for East-West Express, Inc., a Georgia corporation. On January 14, 2007, they were returning to Georgia from a trip to California when they came upon a multiple-vehicle pileup on an icy bridge on Interstate 20 in Tarrant County. Ronnie, who was driving the tractor-trailer, was able to stop without hitting any of the vehicles. A dump truck pulling an excavator was behind the Laniers. The driver of the dump truck, David Allen Beavers, was unable to stop, jackknifed, and collided with the Laniers' rig, knocking it into another vehicle.

Emergency medical technicians checked Ronnie and Tammy at the scene, but neither was transported to the hospital. Three days after Ronnie arrived back in Georgia, he went to a doctor complaining of neck and back pain. The doctor diagnosed him with a neck strain and prescribed

pain medication. The medication, however, did not resolve the problem and, in February, Ronnie went to a hospital emergency room, where he was again told he had a strained neck and back. About two months after the accident, Ronnie was referred to Dr. Roy Baker.

Dr. Baker, a neurosurgeon, ordered various tests and told Ronnie he had a cervical and thoracic strain and had arthritis in his neck. At Dr. Baker's recommendation, Ronnie began physical therapy, which helped for a period of time. In fact, by July, Ronnie was doing well enough to return to work, and he and Tammy made a nine-day trip to California in August. During that trip, Ronnie's symptoms returned, and his hands swelled to the point he could not bend or move them and he was having severe neck pain.

Ronnie said he was in "no shape" to drive, so Tammy drove the entire trip back to Georgia. Once there, he went to Dr. Baker, who advised him that surgery was an option but that it was a "gamble." Ronnie said he "took the gamble and lost." In November 2007, Ronnie underwent a three-level cervical spine fusion. Although the surgery alleviated the swelling in his hands, he said he continues to have constant pain in his neck and shoulders. Although he "hurts all the time," the pain is "not near as bad as it was" and is tolerable with pain medication.

After the surgery, Dr. Baker referred Ronnie to physical therapy, but Ronnie said the treatment did not help. Dr. Baker then referred him to a pain management specialist, Dr. Keith Kirby. Ronnie said Dr. Kirby has performed "radio frequency" treatments and injections to treat the pain, and the procedures have provided temporary relief for a few months at a time.

Ronnie testified he understood from Dr. Baker that he had arthritis in his neck. However, he said he had never had any problems with his neck, shoulder, or arms before the accident and had been in "good health." He said he did not go to the hospital at the scene of the accident because he did not realize he was hurt.

3

Because of his physical condition, Ronnie testified he can no longer do long-haul truck driving because his body cannot "take it" and because he cannot drive while taking pain medications. He said he reads at a third- or fourth-grade level and, with his physical problems, did not know of any job he could do. At the time of trial, Ronnie remained under Dr. Kirby's care. He last saw Dr. Baker a year-and-a-half before trial.

Since the crash, Ronnie's activities have been limited by his pain. Tammy testified Ronnie cannot ride for any length of time in a car, walk for very long, or work in the yard raking leaves or chopping wood. He can ride a lawn mower, but for no longer than two to three laps. He has difficultly sitting or standing for any length of time and basically has difficulty getting comfortable without hurting. She said she and Ronnie have "no intimacy" at all.

The jury also heard from Ronnie's doctors. Dr. Baker testified he first saw Ronnie in March 2007. He performed a neurologic examination and ordered x-rays, an MRI, and a myelogram. The neurologic examination tested Ronnie's strength, sensation, and reflexes in his arms and legs, and the results were normal. The MRI showed degenerative, or arthritic, changes in his cervical spine, and in particular, "some stenosis or narrowing, bone spurring" between the fifth and sixth vertebrae and between the sixth and seventh vertebrae. As Dr. Baker explained, the bottom two disks in Ronnie's neck were "pretty well worn out" and he had a "good bit of arthritic change there." The myelogram showed some bone spurs, particularly at the fifth and sixth vertebrae, with a "little bit of nerve root compression." After completing all the tests, Dr. Baker diagnosed Ronnie as have cervical spondylosis, which he described as arthritis or arthritic changes, probably aggravated by the trauma of the accident. Dr. Baker acknowledged the accident did not cause the arthritis. Dr. Baker did not observe any acute or gross injury or trauma related to the accident on the images.

4

Dr. Baker said he recommended physical therapy and, by July 2007, Ronnie was doing "amazingly well." Ronnie had full range of motion in his neck, had excellent strength in his arms and legs, and had only "a little twinge of pain" in his right shoulder blade. Ronnie told Dr. Baker he "wanted to go back to work the next day," and Dr. Baker said there was no physical reason that could be objectively verified to prevent Ronnie from returning to work.

Late the following month, Ronnie returned to him and said he was trying to go back to work as a truck driver but was starting to have more pain in his neck, radiating down into his arm, and was losing the use of his fingers. Dr. Baker ordered another MRI, which showed multiple-level degenerative disk changes, particularly at C5-C6, a bulging disk at C4-C5, and degenerative changes at C6-C7. At that point, Dr. Baker diagnosed three-level disk disease. Dr. Baker said the options were surgery or continuing medical treatment with arthritis pills, therapy, and "that sort of thing." Ronnie opted to have surgery, and in November 2007, Dr. Baker performed a three-level spinal fusion.

The surgery showed all three levels—C4-C5, C5-C6, and C6-C7—had some bone spurring, which Dr. Baker said "implies that whatever is going on there had been there for some time," and a small amount of disk herniation. The goal of the surgery was to relieve pain by decompressing the nerves and stabilizing the bones of Ronnie's cervical spine. About two weeks after the surgery, Dr. Baker said Ronnie was "doing great" and was "healing well." He told Dr. Baker that he was feeling "a lot better than he did before the surgery." A couple of weeks later, Ronnie was "doing pretty well," although he had "some complaints" of pain in the muscle that goes between the neck and shoulders. Dr. Baker recommended post-surgery physical therapy so that Ronnie could increase his strength and flexibility of his muscles. Dr. Baker testified that, after the surgery, Ronnie "did very well all things considered." Although he was not entirely

pain-free, his pain "seemed to be at a far lower level post-op." But because of Ronnie's "ongoing discomfort," he referred him to Dr. Kirby in June 2008.

Dr. Baker testified that during his treatment of Ronnie, Ronnie told him he had never had neck problems before the accident and had nothing but pain since then. Based on Ronnie's reported history, he believed that while the accident did not cause the arthritic changes in Ronnie's neck or his bone spurs, it clearly aggravated Ronnie's pre-existing degenerative condition. In other words, Dr. Baker said the accident "turned a problem which was not causing him problems into one which was causing him pain."

Upon questioning by appellees, Dr. Baker acknowledged that driving a truck, as well as the auxiliary tasks of loading, unloading, and throwing straps across it, can be an aggravating factor for a person who has spondylosis or stenosis in the cervical area. He also agreed that sitting in a slumped position for prolonged periods, with hands out in front, places strain on the cervical area and would aggravate a neck ache. During the first meeting with Ronnie and every meeting thereafter from March to July 2007, based on a review of Ronnie's history and the objective evidence, he was unable to conclude anything other than degenerative conditions with respect to Ronnie's cervical spine. He agreed the findings on the x-rays, MRI, and myelogram all showed degenerative changes. Finally, he also acknowledged that a person can have an asymptomatic degenerative condition, go to sleep one night, and wake up the next morning and suddenly be symptomatic.

Dr. Kirby, a board-certified physical medicine and rehabilitation physician, first saw Ronnie in August 2008. He testified Ronnie reported to him that he had "ongoing, never ending pain" in his neck, back and shoulders. Dr. Kirby believed the pain from the nerve impingement was resolved by the surgery, and Ronnie was left with "arthritic pain that referred pain into . . .

6

his shoulder area." Dr. Kirby increased Ronnie's pain medications and performed two cervical facet blocks to numb the nerves and two "radio frequency" procedures on Ronnie. The procedures provided temporary relief.

In January 2010, Dr. Kirby performed a disability rating for Ronnie and gave him a whole body disability rating of 20 percent. In February, Ronnie underwent a functional capacity evaluation. The evaluation was a four-hour test in which Ronnie was asked to perform various functions, such as walking, climbing stairs, and lifting various amounts of weights. Dr. Kirby said every function increased Ronnie's pain. Although Ronnie demonstrated the ability to perform medium physical demands, Dr. Kirby opined that Ronnie was not physically capable of returning to work as an "over-the-road" truck driver.

Finally, Dr. Kirby believed that based on a reasonable medical probability, Ronnie will never be pain-free. He also agreed with Dr. Baker that Ronnie had degenerative changes in his spine before the accident, but that the accident "aggravated, accelerated, and excited" any pre-existing degenerative changes. Dr. Kirby explained that when a person has any type of "acceleration deceleration" injury to the cervical spine, it creates stress on "the ligaments, the bony structures." Inflammatory "chemical mediators" respond to an injury and cause an inflammatory response, resulting in swelling and increased blood flow. Dr. Kirby said the blood vessels "can become leaky" and the inflammatory response can "sensitize the ligaments, the nerves in the area," and create pain. Usually, these injuries resolve over time, but Dr. Kirby said Ronnie had pre-existing degenerative changes in his neck. The area became sensitized, and Ronnie continued to have pain.

In addition to the medical evidence, the Laniers also presented evidence regarding Ronnie's ability to work. Dr. William Burke, a rehabilitation specialist and psychologist,

testified Ronnie suffers from chronic, debilitating pain that prevents him from sleeping, from sitting comfortably, from standing or walking for more than 30 or 40 minutes, and from lifting more than ten pounds. Given his physical condition, Dr. Burke said Ronnie could not sustain employment on an eight-hour basis, five days a week, and "certainly can't go back to work as a truck driver." While a younger person would be retrained for a job that was less strenuous, Dr. Burke said Ronnie's age (56 at trial) and reading level precluded that. Dr. Carl Hansen, a vocational rehabilitation counselor, testified he performed a disability analysis for Ronnie and concluded he is totally disabled. Given the pain associated with Ronnie's condition, he did not believe Ronnie could return to work as an "over-the-road" truck driver. Further, he said Ronnie did not have the practical ability to "go into the labor market" given his age, the lack of transferrable skills, and limited reading ability.

In contrast to the Laniers' medical evidence, appellees presented the testimony of Dr. John Sklar, a board-certified physical medicine and rehabilitation physician. Dr. Sklar reviewed Ronnie's medical records and, in particular the various images (x-rays, MRIs, myelogram), and said there was nothing in them to explain Ronnie's pain. Like Dr. Baker, Dr. Sklar testified the images showed a degenerative condition in Ronnie's neck, but he did not see anything on the "imaging" attributable to the accident. He disagreed with Dr. Baker's opinion that the accident aggravated or worsened Ronnie's pre-existing degenerative condition, saying he did not believe the neck strain made Ronnie's condition worse. He said there was no "good explanation" for how someone would have "this type of injury" and be complaining of pain months or years later. As a chronic pain specialist, he believed the factors involved are more psychological than physical in chronic pain. As for Ronnie, given that he still has pain after the surgery, he believed he would have chronic neck pain, but he could not say what was causing that pain.

As for Ronnie's limitations and prospects for returning to work, Dr. Sklar did not believe from a medical perspective that Ronnie needed to be placed on "restrictions." For example, he said Ronnie's medical records suggested a ten-pound lifting restriction, which he termed "ridiculous." Based on his treatment of other over-the-road truck drivers and his knowledge of what their positions require, he believed Ronnie could go back to truck-driving. To the extent pain medications present a problem, Dr. Sklar said there are non-narcotic medications effective in alleviating pain. There was nothing in the medical records that would cause him to place Ronnie on medical restrictions that would preclude him from reentering the workforce. Instead, he said if he were treating Ronnie, he would advise him to be as active as possible and return to work. Finally, he testified that, in looking at the records, the surgery was performed due to spinal stenosis. He explained spinal stenosis is a degenerative condition, not an injury-related condition, so the surgery was not related to the accident.

Dr. Dillon Snowden, a certified vocational rehabilitation counselor, agreed Ronnie could return to work although he probably could not return to long-haul truck driving. She testified there was nothing in the record to support the assessment of Dr. Hansen that Ronnie is totally disabled. She identified different driving jobs she believed Ronnie could perform given his degenerative condition, such as business limousine services or light delivery or logistics, going in house with a trucking company and working in dispatch, scheduling, or trip planning.

After hearing the evidence, the jury found in favor of the Laniers on the liability issue and then awarded damages. To Ronnie, the jury awarded $7,000 for past physical pain and mental anguish; $19,000 for past loss of earning capacity; $5,000 for past physical impairment; and $100,000 in past medical expenses. The jury awarded zero future damages on these elements. As for Tammy, the jury awarded $2,000 in past physical pain and mental anguish;

9

$17,050 for past loss of earning capacity; $1,500 for past physical impairment; and $18,000 for past medical expenses. The jury awarded zero future damages on these elements as well as her claims for past and future loss of household services and loss of consortium.

In their first two issues, the Laniers challenge the jury's failure to find damages (1) for physical pain and mental anguish, medical expenses, physical impairment, and loss of earning capacity that would in reasonable probability be sustained by Ronnie in the future and (2) for loss of consortium and loss of household services in the past and that would in reasonable probability be sustained in the future by Tammy. They argue compelling evidence was presented on these issues, and the zero awards are so against the great weight and preponderance of the evidence as to be manifestly unjust.

In reviewing the Laniers' factual sufficiency challenges, we examine all of the evidence in the record, both for and against the challenged finding, in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on motion for reh'g). When we review the evidence, we may not reweigh it and set aside the verdict merely because we feel a different result is more reasonable. *Pool*, 715 S.W.2d at 634. The jury is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The jury may believe one witness and disbelieve another and resolves any inconsistencies in any witness's testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). Finally, we are mindful the jury in this case was not convinced by a preponderance of the evidence. *See Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

The jury generally has great discretion in considering evidence on the issue of damages. *McGalliard*, 722 S.W.2d at 697. Matters of pain and suffering, mental anguish, physical impairment, and loss of consortium are necessarily speculative, and it is particularly within the jury's province to resolve these matters and determine the amounts attributable thereto. *Belford v. Walsh*, No. 14-09-00825-CV, 2011 WL 3447482, *7 (Tex. App.—Houston [14th Dist.] Aug. 9, 2011, no pet.) (mem. op.) (pain, disfigurement, physical impairment); *P.T. & E. Co. v. Beasley*, 698 S.W.2d 190, 196 (Tex. App.—Beaumont 1985, writ ref'd n.r.e.) (loss of consortium and "its constituent elements necessarily involve subjective states incapable of precise translation into a monetary amount").

When uncontroverted, objective evidence of an injury is presented and the causation of the injury has been established, courts are more likely to overturn jury findings of no damages for past physical pain and impairment. *See Blizzard v. Nationwide Mut. Fire Ins. Co.,* 756 S.W.2d 801, 804–05 (Tex. App.—Dallas 1988, no writ); *Byrd v. Westerhof*, No. 03-00-00180-CV, 2001 WL 101517, at *3 (Tex. App.—Austin Feb. 8, 2001, no pet.). On the other hand, if the indicia of injury are more subjective than objective in nature, appellate courts are generally more reluctant to hold a jury finding of no damages contrary to the great weight and preponderance of the evidence. *See Blizzard,* 756 S.W.2d at 805; *Byrd*, 2001 WL 101517, at *3. Finally, uncontroverted, objective evidence of injury does not always require mental anguish damages. *Lamb v. Franklin,* 976 S.W.2d 339, 341 (Tex. App.—Amarillo 1998, no pet.).

When there is conflicting evidence about the severity of the injuries or about whether the injuries were caused by the collision, the jury has the discretion to resolve the conflicts, determine which version of the evidence to accept, and refuse to award damages. *Byrd*, 2001 WL 101517, at *3 (citing *e.g., Lamb,* 976 S.W.2d at 342–43; *Wagner v. Taylor,* 867 S.W.2d 404,

11

405 (Tex. App.—Texarkana 1993, no writ); *Pilkington v. Kornell,* 822 S.W.2d 223, 230 (Tex. App.—Dallas 1991, writ denied); *McGuffin v. Terrell,* 732 S.W.2d 425, 428 (Tex. App.—Fort Worth 1987, no writ); *Szmalec v. Madro,* 650 S.W.2d 514, 517 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.); *Middleton v. Palmer,* 601 S.W.2d 759, 765-66 (Tex. Civ. App.—Dallas 1980, writ ref'd n.r.e.)). Or the jury may determine that only part of the injuries was caused by the collision at issue and award damages accordingly. *Id.* (citing *e.g., Lamb,* 976 S.W.2d at 342-43; *Hogue v. Kroger Store No. 107,* 875 S.W.2d 477, 482 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (op. on motion for reh'g); *Wagner,* 867 S.W.2d at 405; *Pilkington,* 822 S.W.2d at 230). Indeed, courts have upheld jury awards of zero damages when both subjective and objective evidence of injuries existed, so long as the jury's verdict was not so against the great weight of the evidence as to be manifestly unjust. *Id.*; *see, e.g., Pilkington,* 822 S.W.2d at 230–31; *Srite v. Owens-Illinois, Inc.,* 870 S.W.2d 556, 563 (Tex. App.—Houston [1st Dist.] 1993), *rev'd on other grounds,* 897 S.W.2d 765 (Tex. 1995).

Here, the jury awarded Ronnie past damages but denied any future damages on those same elements. Given those findings, it is clear the jury believed Ronnie suffered some injury as a result of the accident. The jury, however, also could have reasonably believed, based on the evidence, that any injury was resolved prior to the trial, and any present or future problems Ronnie was experiencing were a result of his pre-existing condition aggravated by events unrelated to the accident. All of the experts, including Ronnie's doctors, testified the objective medical tests, that is, X-rays, MRIs, and myelogram, did not reveal any acute or gross injury or trauma suffered by Ronnie as a result of the January 14, 2007 accident; rather, the images indisputably showed Ronnie suffered from a pre-existing degenerative, arthritic condition in his cervical spine that was not caused by the accident. Whether the accident aggravated Ronnie's

12

pre-existing condition was in dispute, and evidence pertinent to that issue was conflicting. Ronnie's doctors testified the wreck aggravated and worsened his condition, while Dr. Sklar said it did not. Although appellants complain on appeal that Dr. Sklar was not credible, it was for the jury to decide which witnesses to believe.

In addition to the conflicts noted above, there was also conflicting evidence regarding the limitations of Ronnie's pain and his ability to work in the future. Ronnie testified that given his physical problems and reading limitations, he did not know of any job he could do. His experts likewise agreed, saying he could no longer work because of his pain, lack of skills, and reading limitations. In contrast, appellees' experts testified Ronnie was able to reenter the labor force with Dr. Sklar testifying Ronnie can do what he chooses to do and Dr. Snowden suggesting particular job areas.

It was the jury's role to determine which witnesses to believe or disbelieve and to resolve any conflicts or inconsistencies in the evidence. Given the record before us, we cannot conclude the jury's findings of zero damages for Ronnie's future physical pain and mental anguish, medical expenses, physical impairment, and loss of earning capacity are so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

As for Tammy's complaint about the jury's failure to award damages to her for past and future loss of household services and loss of consortium, we reach the same conclusion. A spouse's claim for lost consortium and household services is derivative in nature, meaning Tammy must prove Ronnie suffered serious, permanent, and disabling injuries. *See Dunn v. Bank-Tec South*, 134 S.W.3d 315, 325 (Tex. App.—Amarillo 2003, no pet.). She must also link the existence of those injuries to the diminished or missing affection, solace, companionship, society, assistance, and sexual relations contemplated within the theory of consortium. *See id.*

As outlined previously, the evidence was conflicting and described subjective pain. The experts agreed the degenerative condition was not caused by the accident, and the experts disagreed as to whether the degenerative condition was aggravated by the wreck. Given the jury's answers to the future damages, it apparently believed Ronnie did not suffer a permanent, disabling injury. Although Tammy testified about Ronnie's limitations around the house and the lack of intimacy between the two, she is not a "disinterested witness." *See id.* As in *Dunn*, the ailments she describes are "inherently subjective in nature" and whether the jury believed them to exist depended upon whether they viewed the witness as credible. We cannot say the jury's refusal to award her damages for past and future loss of consortium and household services was against the great weight and preponderance of the evidence and therefore manifestly unjust. We overrule the second issue.

In their third issue, the Laniers argue they are entitled to a new trial because the evidence of their past medical expenses was not presented in accordance with the supreme court's decision in *Haygood v. De Escabedo*, 356 S.W.3d 390 (Tex. 2011). In *Haygood*, the court held that section 41.0105 of the Texas Civil Practice and Remedies Code limits recovery, and consequently evidence at trial, to only the medical expenses that have been or must be paid by the claimant. *Id*. at 398. In other words, if the medical bills have been paid, a claimant's unadjusted medical bills are irrelevant and inadmissible. *See id.*

In this case, evidence as to past medical expenses was presented exactly as requested by the Laniers. The Laniers did not seek, and in fact objected to, submission of evidence as to the amounts actually paid. Given the Laniers' position at trial, we conclude they have failed to preserve any issue for review. *See* TEX. R. APP. P. 33.1. We overrule the third issue.

In its appeal, National Liability and Fire Insurance Company brings five issues related to the reimbursement of its workers' compensation lien. National first challenges the trial court's take-nothing judgment on its breach of contract claim against General Insurance Company of America and Eastern Foundations, Inc. In four other issues, National challenges the trial court's allocation of the workers' compensation intervention amounts.

At the time of the accident, the Laniers were Georgia residents and were employed by East-West Express, Inc., a Georgia corporation. National was the workers' compensation carrier for the Laniers' employer and paid benefits totaling $462,565.82 to the Laniers for the injuries they sustained in the accident. General was the liability insurance carrier for Eastern Foundations, which owned the vehicle Beavers was driving when he collided with the Laniers' vehicle.

Several months after the Laniers filed their personal injury lawsuit against the Eastern Foundation defendants, National intervened to claim subrogation rights to the Laniers' recovery. After the Laniers settled their workers' compensation claims with their employer and National, National amended its petition in intervention to include a breach of contract claim against General and Eastern Foundations. Specifically, National alleged it had a pre-litigation written agreement by which General agreed to pay 70 percent of its liens and that General refused to fund the settlement after the workers' compensation claim was resolved.

Before trial began on the underlying case, the parties agreed to a bench trial on National's breach of contract claim. After the jury's verdict, the trial court conducted the bench trial on the contract claim and, after hearing the evidence, found in General and Eastern Foundations's favor and rendered a take-nothing judgment. At the same time, the trial court considered the Laniers'

15

post-judgment motions for determination as to choice of law and to allocate workers' compensation intervention amounts. With respect to the motions, in its judgment, the trial court ordered the award to Ronnie Lanier in the amount of $153,539.18, consisting of the verdict and prejudgment interest, be awarded to National and be "apportioned to [the Laniers'] counsel in its entirety." The judgment ordered the award to Tammy Lanier be awarded to her in full and that National take nothing in its intervention as to her. The trial court subsequently made findings of fact and conclusions of law on all of these issues.

In its first issue, National argues the trial court erred in failing to find there was an agreement between National and Eastern to settle National's claims when the evidence showed a "written, unambiguous offer and acceptance" between the parties.

At the bench trial, three witnesses testified: Loren Smith, counsel for National, and Brent Colton and Michael Kreutzer, General's adjusters on the Lanier file. Of the three, only Kreutzer was involved in the writings relied upon by National to establish an agreement. Evidence showed that Kreutzer wrote a December 30, 2008 letter to Jennifer Bobbitt of Associated Claims Administrators, Inc., the third-party administrator for National. The letter provided, in relevant part:

> It was a pleasure talking to you today regarding the claims for Ronnie and Tammie Lanier. . . .As we have discussed, this matter is approaching the Statute of Limitations, which is January 14th, 2009. We will be working with the attorney representing Ronnie and Tammie Lanier in an effort to resolve this matter before they are forced to file suit regarding this auto accident dated January 14th, 2007.

> As I have explained, we believe Mr. Lanier is partially responsible for this loss; further, his damages may be reduced by any percent of responsibility a jury sees fit. We have respectfully requested that Associated Claims Administrators, Inc. accept a reduction in their lien relating to the claims for Ronnie and Tammie Lanier. The purpose of this reduction will assist us in negotiating an early resolution to this matter rather than proceeding into lengthy and costly litigation for all parties.

> If you are in agreement to accept this reduction, please advise as soon as possible.
> Thank you for your assistance in getting this matter resolved.

On the same day, Todd Handelman, counsel for ACA in the subrogation claim, responded by email: "We are willing to reduce our lien amount by 30% on each claim. Please advise me of the developments of this matter as soon as possible."

At trial, Kreutzer explained he wrote the letter to follow up a conversation he had with Bobbit. Kreutzer said he never offered anyone on behalf of ACA that General would unconditionally pay 70 percent of the amount National paid out to the Laniers; rather, he said he asked for a 30 percent reduction of the lien in hopes of achieving a global resolution. He acknowledged the term "global settlement" was not used in the December 30th letter, nor was the term "contingent."

After hearing the evidence, the trial court found in General's favor. Relevant to this issue, the trial court found (1) Kreutzer sent a letter to National "discussing the potential reduction of the workers' compensation lien for the purposes of attempting to settle the entire case"; (2) National responded to Kreutzer "discussing the potential reduction of the workers' compensation lien for the purposes of attempting to settle the entire case"; and (3) no agreement was "ever established" between the parties regarding the reduction of the lien. The trial court made the following relevant conclusions of law: (1) National and General did not enter into an agreement regarding the payment of any portion of National's asserted lien in this case and (2) there was no meeting of the minds between the parties on the alleged agreement.

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Principal Life Ins. Co. v. Revalen Dev. LLC*, 358 S.W.3d 451, 454 (Tex. App.—Dallas 2012, pet. ref'd). Therefore, we review a trial court's findings for legal sufficiency under the same standard as jury findings. *Rich v. Olah*, 274 S.W.3d 878, 883 (Tex. App.—Dallas

17

2008, no pet.). To analyze the legal sufficiency of the evidence, we review the record in the light most favorable to the trial court's finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). A party attacking the legal sufficiency of an adverse finding on an issue on which it bore the burden of proof must demonstrate that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co.*, 46 S.W.3d at 241.

To prove contract formation, a party must prove, among other elements, an offer and acceptance and a meeting of the minds on all essential elements. *Principal Life*, 358 S.W.3d at 454. For there to be an offer which may ripen into a contract by simple acceptance, the offer must be reasonably definite in its terms and must sufficiently cover the essentials of the proposed transaction that, with an expression of assent, there will be a complete and definite agreement on all essential details. *Id*. at 455. The term "meeting of the minds" refers to the parties' mutual understanding and assent to the expression of their agreement. *Id*. To create an enforceable contract, the minds of the parties must meet with respect to the subject matter of the agreement and all its essential terms. *Id*. The parties must agree to the same thing, in the same sense, at the same time. *Id*.

Here, National argues the writings conclusively established an agreement to settle its claims for 70 percent of the amount of liens. We cannot agree. The December 30th letter did nothing more than request National to reduce its liens by 30 percent so General could attempt to settle the case before a lawsuit was filed. While the letter did not specifically use the terms "global settlement," it is apparent from the context of the letter that was its intent. General certainly did not make an unconditional offer to pay 70 percent of the lien in the absence of a

18

global settlement. We conclude the evidence before the trial court supports its findings and conclusions there was no meeting of the minds between the parties and no agreement regarding the payment of any portion of National's asserted lien. We therefore overrule the first issue.

National's second through fifth issues challenge the trial court's allocation of the workers' compensation intervention amounts. Specifically, National contends the trial court erred by (1) reducing National's subrogation interest in Ronnie's recovery for attorney's fees and litigation expenses; (2) finding that National was not entitled to any award out of Tammy's recovery under the "made whole" doctrine; and (3) "holding" that National was entitled to any portion of the Laniers' recovery as the issue is not ripe until the Laniers "actually make a recovery."

With respect to these issues, the trial court concluded that Georgia law applied to the determination of National's workers' compensation claim because "'the most significant relationship' to the occurrence and parties with the respect to this issue occurred in Georgia." Further, the trial court concluded Georgia law "applie[d] to the determination of the workers' compensation liens asserted by [National] against [the Laniers]." None of the parties challenge these conclusions; consequently, where appropriate, we also apply Georgia law.

Relevant to the following issues is the Georgia Workers' Compensation Act. Under section 34-9-11.1(b) of the Act, after an employer has paid workers' compensation benefits to an injured employee, the employer or its workers' compensation insurer is granted a subrogation lien for the benefits paid against the employee's recovery from a third-party tortfeasor found liable to the employee for the injury. *See* GA. CODE ANN. § 34-9-11.1(b); *Hammond v. Lee*, 536 S.E.2d 231, 233 (Ga. Ct. App. 2000). To assert the lien, the statute allows the employer or its insurer to intervene in the suit brought by the employee against the third party. *See* GA. CODE

ANN. § 34-9-11.1(b); *Hammond*, 536 S.E.2d at 233. Under the statute, the lien is limited to the amount of the workers' compensation disability benefits, death benefits, and medical expenses paid to the employee and is recoverable only

> if the injured employee has been fully and completely compensated, taking into consideration both the benefits received under this chapter and the amount of the recovery in the third-party claim, for all economic and noneconomic losses incurred as a result of the injury.

GA. CODE ANN. § 34-0-11.1(b); *Hammond*, 536 S.E.2d at 865-66. Further, the Act provides as follows:

> (d) In the event of a recovery from such other person by the injured employee or those to whom such employee's right of action survives by judgment, settlement, or otherwise, the attorney representing such injured employee or those whom such employee's right of action survives shall be entitled to a reasonable fee for service; provided, however, that if the employer or insurer has engaged another attorney to represent the employer or insurer in effecting recovery against such other person, then a court of competent jurisdiction shall upon application apportion the reasonable fee between the attorney for the injured employee and the attorney for the employer or insurer in proportion to services rendered. The provisions of O.C.G.A. §§ 15-19-14 and 15-19-15 shall apply.

GA. CODE ANN. § 34-0-11.1(d).

With these provisions in mind, we begin with National's second and fourth issues challenging the trial court's award of attorney's fees and expenses to Ronnie Lanier's counsel out of National's subrogation interest.

At the time of trial, National asserted a workers' compensation lien in the amount of $346,575.89 against Ronnie, consisting of $129,355.89 in medical benefits and $217,220 in indemnity benefits. The jury awarded Ronnie $131,000, which included $119,000 in economic damages and $12,000 in noneconomic damages.

The evidence showed Ronnie settled his workers' compensation claim with his employer and National on July 12, 2010. A Stipulation and Agreement was entered into by the parties

under which National agreed to pay Ronnie $140,000, in addition to the amounts previously paid, as "full, final, and complete satisfaction and settlement of any and all claims . . .." The Stipulation and Agreement contained the following subrogation clause:

> The employer-insurer and their servicing agent are subrogated to any and all rights of recovery the claimant may have against any third party which may be liable for the compensable injury, as well as any proceeds of any settlement on judgment from such part, for the amount of benefits and settlement paid. Therefore, this Stipulation and Agreement shall not, in any way, end, or in any way impair, the rights of workers' compensation subrogation that EAST-WEST EXPRESS, INC., NATIONAL LIABILITY & FIRE INSURANCE COMPANY, and ASSOCIATED INSURANCE ADMINSTRATORS, INC. (ASSOCIATED CLAIMS ADMINISTRATORS) may have, whether under the law of this, or any other, state.

In conclusions of law, the trial court determined that Ronnie's recovery was subject to the contractual rights of the Stipulation and Agreement. Because the S&A was contractual, it modified the Georgia statutory subrogation procedure, "and, as such, the workers' compensation lien is subject to 'first recovery' instead of 'made-whole.'" Further, the court concluded the S&A was "not ambiguous and can be given a certain and definite meaning." The trial court also, however, awarded attorney's fees and expenses to the Laniers' counsel out of National's subrogation interest.

On appeal, National argues that based upon the S&A and the above conclusions of the trial court, its rights in this case are governed by contract, not the Georgia subrogation statute. Therefore, it argues under the contract it was entitled to the jury's entire award to Ronnie as reimbursement for benefits it paid without any reimbursement for the attorney's reasonable fee for services. We cannot agree.

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the agreement. *Coker v. Coker*, 650 S.W.2d 391, 393

21

(Tex. 1983). To achieve this objective, courts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all provisions* of the contract so that none will be rendered meaningless. *Id*. No single provision taken alone will be given controlling effect; rather, all provisions must be considered with reference to the whole instrument. *Id*.

Examining the agreement as a whole, we initially note it contains numerous references to the Georgia subrogation statute. Among other things, the agreement itself is made under the statute and the parties stipulate the Georgia State Board of Workers' Compensation "has exclusive jurisdiction" of any claim by Ronnie against his employer. Further, it contemplates the need for the approval of the Georgia State Board of Workers' Compensation and provides citations to the statute when setting out the evidentiary disputes of the parties. Within this agreement, the parties included a subrogation clause that, we agree, provides for a "contractual first money right of subrogation.'' But reading this clause in light of the remainder of the agreement, we conclude the parties intended nothing more than to modify one aspect of the Georgia statute, that being the made-whole provision. Nothing in the clause purports to supplant the statute in its entirety, and it does not purport to modify the Georgia statute's mandate to allow the attorney representing the employee to recover reasonable fees for his services.

In reaching this conclusion, we are unpersuaded by National's reliance on the Texas Supreme Court's decision in *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 648 (Tex. 2007). In *Fortis*, the court was considering the "equitable 'made whole' doctrine" and its effect, if any, on a contractual first-money subrogation clause contained in a health insurance policy. But the Laniers are not relying on equitable considerations in this case, and the *Fortis* court was not considering an agreement and its impact on the entire statutory workers' compensation scheme of another state. Under these circumstances, we conclude it is inapposite to the facts before us.

22

We conclude the contractual provision had limited effect and did not modify the statute's provisions regarding attorney's fees. Further, National has not challenged the amount of the award that the trial court found under the statute; therefore, we do not address that issue. We overrule the second issue.

In its fourth issue, National contends the trial court erred in reducing its subrogation interest based upon the amount of the Laniers' litigation expenses when the Act allows only for the recovery of "reasonable fee for services."[1] *See* GA. CODE ANN. § 34-0-11.1(d). The issue here is whether "reasonable fee for services" encompasses litigation expenses. Neither side directs this Court to any Georgia case interpreting this language.[2]

When construing a statute, our primary objective is to ascertain and give effect to the legislature's intent. TEX. GOV'T CODE ANN. § 312.005; *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). To discern that intent, we begin with the statute's words. TEX. GOV'T CODE ANN. § 312.003; *TGS-NOPEC Geophysical*, 340 S.W.3d at 439. If a statute uses a term with a particular meaning or assigns a particular meaning to a term, we are bound by the statutory usage. *TGS-NOPEC Geophysical*, 340 S.W.3d at 439. Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning. *Id*. If the meaning of statutory language is unambiguous, we adopt the interpretation supported

---

[1] In the findings of fact, the trial court found that Ronnie's portion of the verdict was about 75 percent of the total verdict and allocated 75 percent of his counsel's "case expenses" to Ronnie's portion of the judgment. The court found case expenses were "those costs submitted by Ronnie Lanier's counsel less the taxable costs." In an earlier letter ruling to the parties, the trial court stated he considered "case expenses" to include "those expenses offered at the hearing less taxable costs, such as court reporter fees, filing fees, service fees, etc."

[2] The Laniers assert that Georgia courts have interpreted "fee" as used in O.G.C.A. § 15-19-14(b) relating to liens of attorneys to include fees and expenses. *See Ellerin & Assoc. v. Brawley*, 589 S.E.2d 626, 627 (Ga. Ct. App. 2003). Nothing in this case purports to define "fee" for purposes of the statute. Rather, the court concluded the clients' obligation to pay expenses was controlled by the fee agreement, which the court ultimately determined was unenforceable. *Id*. at 630. The court remanded so that the trial court could determine whether expenses sought by the attorney were recoverable under quantum meruit.

23

by its plain language unless such an interpretation would lead to absurd results. *Id*. Finally, we consider statutes as a whole rather than their isolated provisions. *Id*.

"Fee" is not defined in the statute. In common usage, fee means "compensation often in the form of a fixed charge for professional service . . .." WEBSTER'S THIRD NEW INT'L DICTIONARY 833 (1993). In other words, fee means the charge for the attorney's services. That charge could come in the form of a percentage of the recovery or the hourly rate times the hours expended. But nothing in the ordinary meaning of the word suggests that "fee" encompasses litigation or case expenses, nor does the language of the statute itself lend itself to such an interpretation. Our conclusion is bolstered by the fact that the Georgia legislature has expressly provided for the payment of litigation expenses in other contexts. *See* GA. CODE ANN. § 9-15-14 (allowing for "reasonable and necessary attorney's fees and expenses of litigation" when a party has brought a frivolous claim, defense, or other position); GA. CODE ANN. § 13-6-11 (generally disallowing "expenses of litigation" as part of damages, but allowing jury to award them in cases where plaintiff has pleaded for them and defendant has "acted in bad faith, has been stubbornly litigious, or has caused plaintiff unnecessary trouble and expense"); GA. CODE ANN. § 9-11-11.1(b) (providing that if claim is verified in violation of Anti-SLAPP statute, court may order party to pay other party's "reasonable expenses incurred because of the filing of the pleading, including reasonable attorney's fee"). Had the Georgia legislature intended fees to encompass litigation expenses in the Workers' Compensation Act, it could have included such language in the statute as it did in these statutes. Because we conclude the Workers' Compensation Act does not provide for payment of expenses, we sustain the fourth issue.

In its third issue, National argues the trial court erred in finding that it was not entitled to any award out of Tammy's recovery under the "made whole" doctrine. National does not

24

dispute that Tammy's claim is governed by the Georgia statute; rather, it argues she was fully and completely compensated by the jury's verdict.

On August 27, 2008, Tammy Lanier settled her workers' compensation claim with her employer and National and entered into a "Stipulation" with those parties, which was submitted to the Georgia State Board of Workers' Compensation for approval. At the time of trial, National asserted a workers' compensation lien in the amount of $115,989.93 against Tammy, consisting of $23,355.48 in medical benefits and $92,541.45 in indemnity benefits. The jury awarded Tammy $35,050 in economic damages, consisting of $17,050 for past loss of earning capacity and $18,000 in past medical expenses. In addition, she was awarded $3,500 in noneconomic damages. The trial court found that for purposes of the workers' compensation lien, Tammy was not "made whole" by the jury's verdict.

As stated previously, the Georgia's Workers' Compensation Act is a "made whole" statute, meaning an injured employee must be made whole before the employer, or its insurer, may recover from a third-party tortfeasor. *See* GA. CODE ANN. § 34-9-11.1(b); *Liberty Mut. Ins. Co. v. Roark*, 677 S.E.2d 786, 788 (Ga. Ct. App. 2009). The employer/insurer carries the burden to establish that the employee has been fully and completely compensated, whether the employee has received compensation from the tortfeasor through a jury award or by settling his claim against the tortfeasor. *Ga. Elec. Membership Corp. v. Hi-Ranger, Inc.*, 563 S.E.2d 841, 843 (Ga. 2002); *Austell Healthcare, Inc. v. Scott*, 707 S.E.2d 599, 601 (Ga. Ct. App. 2011). The statute provides no method by which an employer can establish the workers' compensation recipient has been fully and completely compensated by a recovery from a third-party tortfeasor. *Bartow County Bd. of Educ. v. Ray*, 494 S.E.2d 29, 30 (Ga. Ct. App. 1997, cert. denied). Utilizing a special verdict form may be the most practical solution. *Id.*

Here, the jury returned a verdict allocating damages to the specific elements. In its brief, National asserts Tammy was made whole from the jury verdict for medical expenses and lost wages "as National paid more in benefits for these elements than were awarded by the jury." As support, National quotes two paragraphs of a Georgia case that concluded the employee had been fully compensated for medical expenses, highlighting the following sentence: "Where there has been a jury trial with a special verdict form, the allocation of any award is controlled by the jury verdict." *See N. Bros. Co. v. Thomas*, 513 S.E.2d 251, 254 (Ga. Ct. App. 1999, cert. denied). To the extent National suggests the issue is solely resolved by whether the jury verdict is less than the amount paid in workers' compensation benefits, we cannot agree.

In *Thomas*, the worker admitted the medical benefits paid under his workers' compensation claim were at least $60,030.37, and the jury awarded him $25,000 for medical expenses. In concluding the worker was fully compensated for this element, the court noted there was "nothing in the record to show the employee had any outstanding medical or other claims or obligations which should be considered in determining whether or not he has been fully compensated." *Id*.

As for wages, the court explained that where the employee's weekly wages exceeded the amount of the weekly benefit actually received, "the employer would not be allowed to recover the weekly benefits paid unless and until such time as the employee has been compensated for the difference between the workers' compensation weekly benefit actually received and the employee's normal weekly wage." *Id*. at 253-54.

In a second case, *Hammond v. Lee*, 536 S.E. 231, 233 (Ga. Ct. App. 2000), Hammond was injured in a job-related automobile accident. Hammond's personal injury suit was tried before a jury and was bifurcated into two phases. In the first phase, Hammond's claim against

26

the third party was tried. The jury awarded Hammond medical expenses of $3,343; past lost wages of $2,165; future lost wages of $0; and $2,500 for pain and suffering. *Id*.

In the second phase, the issue was whether the insurer was entitled to a subrogation lien under the Workers' Compensation Act. The jury then heard evidence that Hammond filed a workers' compensation claim, and the workers' compensation carrier paid her more than $133,000 in workers' compensation benefits, including $74,651.11 for lost wages and $58,679.50 in medical expenses. *Id*.

The court first concluded that the insurer was not entitled to a subrogation lien against Hammond's lost wages because Hammond earned an average of $382.45 per week and the insurer paid her wage benefits of $254.96 through the time of trial, a difference of more than $28,000 in unreimbursed lost wages. *Id*. at 254. That amount exceeded the $2,165 for past lost wages recovered in the third-party claim. *Id*.

As for medical expenses, Hammond testified that she incurred $3,460.42 in medical expenses that were unreimbursed by workers' compensation, but she also said the total of medical expenses she incurred as a result of the accident were $47,475.79. *Id*. Because other undisputed evidence showed the insurer paid more in benefits, the court concluded Hammond was fully and completely compensated for her medical expenses. *Id*.

Both of these cases suggest the analysis for determining whether an employee has been fully and completely compensated under Georgia law entails more than simply comparing whether the jury allocation is less than the amount paid in benefits. Nevertheless, National has made no attempt to apply the law to the specific facts of this case. It makes no argument regarding any evidence to show that (1) Tammy has no outstanding claims for medical expenses for which she would be liable or (2) she has been compensated for the difference between the

27

workers' compensation weekly benefit actually received and her normal weekly wage.[3]  *See id.* at 253-54; *Hammond,* 536 S.E.2d at 233-34.  Under these circumstances, we conclude National has not shown error.  We overrule the third issue.

In its fifth issue, National argues the trial court's judgment should have contained the following paragraph, instead of "making the mathematical determination of the net amount owing to National" on the Laniers' claim :

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that until there is an actual recovery by Ronnie Lanier, the amount of his litigation expenses, and the net amount to be recovered by Intervenor after payment of one/third attorney's fee and proportional share of the total case expenses cannot be determined, and is not ripe for determination by this Court.

National argues that if the case ultimately settles for more than the judgment, it may be entitled to a larger recovery.  National argues until there is recovery, it "cannot be determined how much National is to receive out of the recovery" and therefore any issue of net amount owing out a "future recovery" was not ripe.  National cites no case law for this proposition.  Regardless, we disagree.  At the time of the trial court's determination, the only recovery available to the Laniers was the amount awarded by the jury.  Thus, the issue was ripe for determination.  We overrule the fifth issue.

We reverse that portion of the trial court's judgment ordering the award to Ronnie Lanier in the amount of $153,539.18 to be awarded to National and apportioned to the Laniers' counsel in its entirety.  We render judgment that Ronnie Lanier's recovery in the amount of $153,539.18

---

[3] In the Stipulation, the parties stipulated that as of January 14, 2007, the date of the accident, Tammy was employed "at an average weekly wage of $734.47, generating a weekly compensation rate of $450.00."  Further, the Stipulation provided that "the parties and their attorneys have taken into consideration all questions of disability, medical expenses, rehabilitation and other factors" in reaching the settlement and were settling "past, present and future disability, medical expenses and rehabilitation" for $60,000.  The settlement did not, however, allocate specific amounts for each of damage elements.

is awarded to National of which $51,179.73 is apportioned to the Laniers' counsel. In all other respects, we affirm the trial court's judgment.

/Molly Francis/
MOLLY FRANCIS
JUSTICE

111257F.P05



# Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

RONNIE AND TAMMY LANIER,
Appellants

No. 05-11-01257-CV     V.

EASTERN FOUNDATIONS, INC., DAVID
ALLEN BEAVERS, & CHOICE DRIVERS,
Appellees

NATIONAL LIABILITY AND FIRE
INSURANCE COMPANY, Appellant

V.

RONNIE AND TAMMY LANIER,
EASTERN FOUNDATIONS, INC., DAVID
ALLEN BEAVERS, CHOICE DRIVERS,
AND GENERAL INSURANCE
COMPANY OF AMERICA, Appellees

On Appeal from the County Court at Law
No. 2, Dallas County, Texas
Trial Court Cause No. CC-09-00185-B.
Opinion delivered by Justice Francis;
Justices Lang and Evans participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment ordering the award to Ronnie Lanier in the amount of $153,539.18, consisting of the jury's verdict and prejudgment interest, be awarded to National Liability and Fire Insurance Company and apportioned to the Laniers' counsel in its entirety. We **RENDER** judgment that the award to Ronnie Lanier in the amount of $153,539.18 is awarded to National Liability and Fire Insurance Company of which $51,179.73 is apportioned of the Laniers' counsel. In all other respects, the trial court's judgment is **AFFIRMED**.

30

Judgment entered May 22, 2013.

/Molly Francis/
MOLLY FRANCIS
JUSTICE