**REVERSE in part; AFFIRM in part; REMAND and Opinion Filed July 5, 2024**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-22-01035-CV**

**TEMPO TRANSPORTATION, LLC, Appellant**

**V.**

**J.W. LOGISTICS OPERATIONS, LLC, Appellee**

**On Appeal from the 219th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 219-02738-2020**

## MEMORANDUM OPINION

Before Justices Molberg, Reichek, and Smith
Opinion by Justice Molberg

Tempo Transportation, LLC appeals from a final judgment for J.W. Logistics

Operations, LLC.  In its first seven issues, Tempo challenges the judgment's award

based on a liquidated damages provision in the parties' contract, arguing the

provision is unenforceable.   Tempo also contends the judgment should be modified

to award it a greater amount on its counterclaim, and a partial new trial should be

granted on its attorney's fees claim.  J.W. cross-appeals, arguing (1) the award of

damages to Tempo is based on legally and factually insufficient evidence, (2) the

jury's finding that J.W. was entitled to zero actual damages is against the great

weight and preponderance of the evidence; and (3) the jury's finding that J.W. was entitled to zero attorney's fees is against the great weight and preponderance of the evidence. For the reasons explained below, we reverse and render judgment in part, reverse and remand in part, and affirm in part.

## I. Background

J.W. is a company that provides transportation and logistics services. J.W. and Tempo entered an agreement under which J.W. paid Tempo to provide transportation services for J.W.'s customers. Under this contract, Tempo agreed, among other things, it would not solicit, accept, or otherwise conduct business with any of J.W.'s customers in the same geographical area where Tempo was awarded work under its agreement with J.W. Violation of this non-solicitation provision triggered a liquidated damages provision in the contract. The work Tempo performed for J.W. generally involved Tempo's drivers picking up packages at the Amazon facility in Lenexa, Kansas, and bringing them to post offices.

J.W. filed suit on June 3, 2020, alleging Tempo breached the contract by violating the non-solicitation provision of the contract when it did work for at least one of J.W.'s customers in the same geographical area in which Tempo had been awarded work for Amazon by J.W. J.W. also alleged Tempo tortiously interfered with J.W.'s agreement with Amazon by engaging in the conduct just described. Tempo answered and asserted a counterclaim for breach of contract, alleging J.W. had failed to pay Tempo for services it rendered under the parties' agreement.

At trial, J.W.'s senior vice president of operations and transportation, Dean Roth, testified that J.W. contracted with Tempo to make deliveries from Amazon's Kansas City and J.W.'s Springfield facilities. Regarding the liquidated damages provision in the contract, Roth said that, at the beginning of a relationship with a carrier like Tempo, it is difficult to estimate damages resulting from a breach of the contract's non-solicitation provisions. He said Tempo was never excused in writing from performing its obligations under the agreement.

Roth said that, on November 15, 2019, Tempo, through General Managing Partner Ruth Ospino, provided its thirty-day notice it was ending its business relationship with J.W. Roth responded, "Notice received," stated J.W. would pare Tempo down over the next four weeks, and that he "couldn't agree more on cutting ties in a professional manner." He also stated a wire would be sent with J.W.'s payment to Tempo thirty-one days ahead of the contract's forty-five-day payment deadline. At trial, however, Roth testified the agreement did not allow termination of the agreement at the time because it fell within "peak season," which ran from November through January 15.

Roth testified Tempo failed to abide by the agreement's non-solicitation provisions. He first realized Tempo's breach when he noticed Tempo was copied on an email from Amazon to carriers with "loads directly from Amazon." Roth said there were circumstances when J.W. allowed carriers to work directly with Amazon when the carrier sought permission first; they amended their contracts to allow such

–3–

arrangements. That was not done in this case. Roth said at the time of trial, J.W. no longer had a relationship with Amazon in the Kansas City area; he said Tempo's actions were a "contributing factor" to that loss.

In May 2020, J.W. demanded payment of $1.8 million in contractual damages from Tempo for violating the agreement's non-solicitation provisions. That amount was based upon the liquidated damages provision.

At trial, Ospino agreed Tempo was getting paid by Amazon for work in the Kansas City area not obtained through J.W. as of October 1, 2019. Emails were admitted showing Ospino submitted bids to Amazon for work in Kansas City. Ospino testified that Tempo made about $350,000 from Amazon in the Kansas City area but incurred about $362,000 in expenses, making for a roughly $12,000 loss. She later clarified that thirty to forty percent of those figures included work performed in the Des Moines, Iowa area. Counsel for J.W. challenged Ospino on redirect with her deposition testimony, noting she had not previously mentioned Des Moines.

Ospino also described the process by which Tempo got work from J.W. She said there was a desk shared by Amazon and J.W. employees where Tempo "would check in with J.W.," a Tempo driver would be assigned a route, he would load up his delivery vehicle, and would return to the desk to check out. Packages were scanned into Tempo's system when they were loaded on the vehicle, and they would be scanned again at the point of delivery as proof of delivery. J.W. would send

Tempo "settlement statements," which were daily lists of routes completed along with the pricing, and Tempo responded with any discrepancies or disputes. Ospino said a missing item would be considered a dispute. She said J.W. did not always pay Tempo on time.

Ospino testified that J.W. encouraged Tempo to work directly with Amazon beginning in October 2019, but acknowledged Tempo did not "go through J.W." or the contract process. She said people at J.W.—including regional manager Dave McAnally and "local operations person" Wade Wilken—told her it was okay to go to Amazon directly, but said that arrangement was never put in writing and the contract was never modified. She said Tempo's direct work for Amazon was McAnally's idea in the first instance, and Tempo would never have done the work had he not brought it up. She said one Friday afternoon an expected payment from J.W. did not come through. McAnally told her it was not a reflection of how J.W. did business and that he would take care of her, telling her J.W. was "losing the Amazon business anyway" and that if Tempo kept its trucks running through the weekend, he would "help you so that you don't lose business." She did not follow up on the suggestion immediately, but they discussed it again about a month later in September 2019 when Tempo continued to have issues getting paid by J.W. McAnally sent Ospino a link from Amazon to register to do business directly with Amazon, and then showed her how to register. Tempo started doing some deliveries directly for Amazon in October 2019.

Ospino said McAnally was the regional manager for J.W. and she was directed to deal with him regarding Tempo's work for the company. She dealt with him on everything, "any issues I had with J.W." Ospino said McAnally was not the only J.W. employee who knew Tempo was working directly with Amazon. She said her drivers, when directly delivering for Amazon, checked in at the same table as they would when delivering for J.W. She said J.W. employees were present at that table, and they all knew Tempo was working directly with Amazon. Ospino also said Amazon had something called a "load board," where additional routes could be picked up, and sometimes J.W. would call Tempo in the middle of the night to let them know there were jobs available on the board. "J.W. at that point didn't have the capacity to cover them so they just asked me to cover them on my own," she said. Text messages from Wilken to Ospino were admitted in which he stated there were routes on Amazon's load board if she was interested. Given all of this, Ospino believed J.W. had waived any contractual provisions prohibiting Tempo from working directly for Amazon. She never considered formalizing the new arrangement in writing because she trusted what McAnally and Wilken told her.

Ospino testified she personally observed J.W. losing Amazon business in the Kansas City area, stating there were more carriers in the distribution center than before. Ospino said that when she first started working with J.W. at the Amazon facility, J.W. had between seven and ten employees at the dock at the facility. By late 2019, after layoffs, "there were maybe two left on the dock" and by the first

quarter of 2020, there was just one J.W. employee present, but he too was laid off at some point so that there were no remaining J.W. employees by the time she stopped doing business with Amazon. She said Tempo stopped doing business with Amazon in early 2021 because it was no longer profitable; she said Amazon, perhaps through the aforementioned "load board," had attracted more carriers, creating a "kind of bidding war so the prices were being driven down."

Bryan Finley, a certified public accountant, testified for J.W. after reviewing documents the company provided him. He stated that the estimated amount of incremental net profit earned by Tempo on business conducted directly with Amazon between 2019 and 2021 was approximately $81,000; the estimated amount of lost net profits that would have been earned by J.W. from revenue obtained by Tempo directly with Amazon between 2019 and 2021 was approximately $35,000; and the estimated amount of additional lost net profits that would have been earned by J.W. had it sustained the same level of revenue from Amazon that it achieved prior to the date Tempo began to provide services directly with Amazon (October 2019) for two years was approximately $684,000.

On cross-examination, Finley acknowledged his calculations assumed that J.W. would keep the same level of business with Amazon it previously had. He based his numbers on an average of monthly business J.W. did with Amazon over a nine-month period prior to September 2019, yet he agreed J.W.'s business with

Amazon had dropped substantially over that period, even prior to any breach by Tempo.

Ospino said that "from the very beginning every settlement statement had issues and discrepancies," and as a result, "every settlement was short paid." Some of the disputes were as old as nine months to a year and added up to over $100,000. At her request, on November 12, 2019, Ospino visited J.W. at its Frisco offices to meet to address Tempo's disputes. She said J.W. had left many of Tempo's disputes unaddressed for six to nine months. Ospino said she noticed many open desks in J.W.'s office and said J.W. told her it had to let a lot of people go because of a drop in business—it was losing a lot of its Amazon routes around the country. Ospino met with Michael Simmons and Fernando Noriega, who told her they did not have time to go through all the documentation because they were working with a limited staff.

At the time of the meeting, Tempo was already doing deliveries for Amazon directly, and Ospino said J.W. did not bring up that matter. They told her they would resolve her issues with J.W. by the end of the week. When that did not happen, she felt like she "was never going to get paid," so she submitted Tempo's thirty-day notice of termination. She spoke with Roth—the vice president of operations and transportation—over the phone, and he pointed out that Tempo could not leave the contract because it was peak season but said if Tempo stayed, he would continue to pay within fourteen days of delivery. Ospino said Tempo continued on with J.W.

until the end of March 2020, at which point their relationship ceased because Ospino was still having issues getting paid by J.W. and Tempo could no longer afford to continue the relationship. They did not discuss J.W. doing deliveries for Amazon directly. Ospino said that in March 2020, J.W. was sixty days past due on settlement statements and disputed payments dated back six months.

An email was admitted into evidence from J.W.'s director of transportation network, Michael Simmons, in which he told Ospino and others, on April 1, 2020, that J.W. recognized "the delay in payments being sent out" and that J.W. had "experienced slight delays in getting some payments out due to a downturn in business and multiple other factors." He acknowledged J.W. was "a bit behind and that this is a detriment to you and your business" but stated they were working on a plan to get Tempo "caught back up" as they were "able to make additional payments, getting you closer and closer to terms[.]" On cross-examination, Roth acknowledged nothing in the email accused Tempo of violating the contract or suggested any reason Tempo should not be paid.

At some point, Tempo sold its J.W. invoices to factoring companies. An email was admitted showing Simmons acknowledged all of Tempo's invoices had been purchased by factoring companies; he stated to another colleague that they needed to put together an action plan and timeline to get it paid back. During the cross-examination of Roth, several email exhibits were admitted indicating J.W. employees were committed to paying Tempo—whether Tempo had violated the

contract by working directly with Amazon was never brought up. On re-direct, Roth said he did not find out Tempo had violated the contract until late February, so any emails before then were irrelevant. Tempo eventually repurchased the J.W. invoices from the factoring companies and Ospino stated Tempo owned all of its J.W. invoices at the time of trial.

In May 2020, Ospino emailed J.W.'s owner and asked him for a clear plan of action regarding the $148,271.35 sum she said was in arrears. She stated she wanted to avoid legal action, "as I believe [it would] be costly for both parties." J.W. followed up with a phone call, and one of its attorneys was on the call. Ospino said J.W. told her that if she didn't "take care of [the factoring company MHC]," which had been seeking payments from J.W., they would sue her for doing Amazon work directly. Ospino was surprised by that because "they knew about it all along, they told me to do it, they gave me permission to do it, they saw me do it and they never had a problem with it until that very moment." The phone call was the first time she had received a complaint from J.W. regarding Tempo doing direct deliveries for Amazon. J.W. sued Tempo the following month.

Ospino testified Tempo was seeking $185,118.41 in its counterclaim, which she said was based on work performed for J.W. for which Tempo had not been compensated. She acknowledged the number was previously $202,742.49 and explained the difference by stating the company had done an audit on its disputes and determined the larger number included "some double numbers." Some

–10–

$74,969.75 of Tempo's $185,118.41 claim was for disputed work that J.W. did not agree should be paid. At trial, delivery records were admitted showing the dollar amounts for the deliveries for which Tempo contended it was not paid, and records showing the dollar amounts for the deliveries disputed by J.W. Ospino said J.W. never showed proof that the disputed work was not completed—"they came back with nothing."

Regarding sums Tempo believed it was owed, Roth stated J.W. reviewed disputed amounts and determined J.W.'s rates were correct, Tempo had not hauled the load as claimed, or Tempo could not provide proof it had done so.

Counsel for J.W. testified about his qualifications and the work done for the case. Among other things, he stated his hourly rate was $350 for a total of $83,335 in attorney's fees and $2,313.38 in costs. His assistant's costs were $5,092.06 and costs relating to the retained expert were $43,110. He testified a reasonable amount for conditional appellate fees would be $29,750.

Lead counsel for Tempo testified to Tempo's attorney's fees. He said his rate was $395 per hour but, beginning in May 2021, he discounted Tempo ten percent for an hourly rate of $355.50 per hour; a second attorney on the case billed $450 per hour but, again beginning in May 2021, was discounted one-hundred percent; and a third lawyer who worked on the case billed a discounted $355.50 per hour. Lead counsel testified the three lawyers had prepared court filings, pleadings, exchanged discovery, conducted a deposition, did legal research, and prepared for trial. He said

almost all of his work on the case related to Tempo's counterclaim as opposed to defending against J.W.'s claim and probably ten percent of the work related only to J.W.'s claim. Tempo's legal invoices detailing that work and the time expended were admitted into evidence. Lead counsel testified the hourly rates charged by the three lawyers was reasonable for their levels of experience and for the local market. He said Tempo was seeking $103,000 in fees through trial, and he further testified to reasonable conditional appellate fees. On cross-examination, lead counsel said the third lawyer involved was not involved in the case until a few weeks before trial, and he said they had not decided "whose time is going to be billed, his or mine. The client is only going to be billed for one of them, and it's the same rate."

The jury found Tempo failed to comply with the agreement; Tempo's failure to comply was not excused; Tempo intentionally interfered with J.W.'s agreement with Amazon; Tempo had a good-faith belief it had the right to do business directly with Amazon; J.W.'s reasonable compensation for its damages resulting with Tempo's breach was $0.00; J.W. was entitled to $488,000 under the liquidated damages provision of the agreement; $35,000 would fairly and reasonably compensate J.W. for its damages proximately caused by Tempo's interference; $0.00 was a reasonable fee for the necessary legal services of J.W.'s attorney for the breach of contract claim; J.W.'s costs and related expenses in bringing its claims were $133,850.44; J.W. failed to comply with the agreement, and its failure was not excused; Tempo failed to comply with the agreement first; $147,630.66 would fairly

–12–

and reasonably compensate Tempo for its damages resulting from J.W.'s breach of contract; $0.00 is a reasonable fee for the legal services of Tempo's attorneys for its breach of contract claim; J.W. exercised its right to reduce, deduct, or offset unpaid obligations owed by Tempo under the agreement from amounts Tempo contends were owed by J.W.; and J.W. was entitled to reduce $37,482 from amounts Tempo contended were owed Tempo.

In its motion for entry of judgment, Tempo argued, among other things, the liquidated damages provision was unenforceable for a variety of reasons, including (1) the amount of damages called for was not a reasonable forecast of just compensation, (2) it set the same amount of damages for all alleged breaches, whether trivial or material, (3) it bore no reasonable relationship to actual damages, (4) and even the alleged amount of actual damages was substantially less than the liquidated damages in the contract. Tempo also argued the provision was facially unreasonable because the contract set damages at one year of gross receipts for any violation.

On July 1, 2022, the trial court rendered a final judgment based upon the jury's verdict. It awarded $621,850.44 to J.W., which was the liquidated damages plus

costs,[1] and ordered that Tempo recover from J.W. $110,148.66, which was actual damages awarded less the offset amount found by the jury.[2]

## II. Discussion

### A. Tempo's appeal

#### 1. Liquidated damages provision

Tempo first argues the liquidated damages provision in the parties' agreement is unenforceable because it is a one-size-fits-all penalty. Under the agreement, Tempo agreed not to (1) use or disclose any confidential information belonging to J.W. to any individual, company, or other entity; (2) solicit, accept, or otherwise conduct business with any shipper of J.W., regarding routes or other business in the same geographical area that Tempo was awarded during the term of the agreement; (3) solicit, accept, or otherwise conduct business with any shipper of J.W. that Tempo did not have a business relationship with prior to being awarded business during the term of the agreement; or (4) solicit or enter an employment relationship or independent contractor relationship with any person or entity who was an employee or independent contractor of J.W. or one of its affiliates during the term

---

[1] We note that, as discussed above, the jury awarded J.W. attorney's fees of $0 and costs and related expenses of $133,850.44—a figure apparently based on J.W.'s evidence of attorney's fees. Because the jury awarded this figure as costs, we will refer to this sum as costs throughout this opinion.

[2] In addition to awarding Tempo its damages less J.W.'s offset, the judgment ordered that Tempo take nothing on its counterclaim. Whether this language was intended make clear Tempo's award was an offset to J.W.'s larger recovery, *see Seureau v. Mudd*, 515 S.W.2d 746, 750 (Tex. App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.), or whether it was a clerical error, given our resolution of the issues before us, we will modify the judgment to delete this language given the trial court's clear intent to effectuate the jury's findings.

of the agreement. Tempo consented to the issuance of an injunction enjoining activity in violation of these prohibitions, and the agreement further provided as follows:

> Because it is impossible to ascertain or estimate the exact cost, damage, or injury which JWL might sustain prior to the effective enforcement of such an injunction by reason of a breach of these restrictive covenants, [Tempo] shall also pay JWL the following as damages within ninety (90) days of such violation:
>
>> i. The annual gross receipts for any business lost from a Shipper because of such violation. Annual gross receipts shall be computed based on the gross receipts JWL received from that Shipper for the lost business for the twelve (12) months prior to the loss, or if the Shipper has utilized JWL's services for less than twelve (12) months with regard to the business lost, the gross receipts during the period the Shipper utilized JWL's services shall be annualized for purposes of computing this payment. Such payment will be made for each violation of this Paragraph 17.

"The basic principle underlying contract damages is compensation for losses sustained and no more; thus, we will not enforce punitive contractual damages provisions." *FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 69 (Tex. 2014). A liquidated damages contract provision that establishes an "acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach" is enforceable, but a damages provision that violates the rule of just compensation and functions as a penalty is unenforceable. *Atrium Med. Ctr., LP v. Houston Red C LLC*, 595 S.W.3d 188, 192 (Tex. 2020). "Provisions that apply the same measure of damages regardless of the magnitude of the breach

are facially unreasonable and constitute an impermissible penalty as a matter of law," and "[e]ven in cases where the alleged breach is material, a 'one size fits all' liquidated damages provision will not be enforced." *Shops at Legacy (RPAI) L.P. v. Del Frisco's Grille of Tex., LLC*, No. 05-19-01274-CV, 2020 WL 4745548, at *5 (Tex. App.—Dallas Aug. 17, 2020, pet. denied) (mem. op.).

Tempo argues the contractual damages provision is a "one size fits all" liquidated damages provision because the "twelve months of gross receipts" applies regardless of the magnitude of the alleged breach. We agree with Tempo. Under the provision, the same damages are assessed whether a violation involved $100 worth of business or $1 million of business; it also applies the same damages whether there was one solicitation or one contract with an employee of J.W. or more than one and assesses the same damages for a solicitation that did not lead to business being conducted as a solicitation that led to a substantial amount of business. Consequently, we conclude the liquidated damages provision operates as a "one size fits all" penalty and is unenforceable. We sustain Tempo's first issue; we need not reach its remaining issues challenging the provision in other ways.

### 2. Attorney's fees for J.W.

Tempo also contends a take nothing judgment should be rendered against J.W. because the jury found zero actual damages, and J.W.'s tortious interference claim was barred by the affirmative defense of good faith belief. Tempo thus contends the judgment awarding J.W. costs should be reversed because, given the

unenforceability of the liquidated damages provision, J.W. cannot be considered the prevailing party. We agree. In its petition, J.W. sought attorney's fees and costs pursuant to § 38.001 of the civil practice and remedies code and its agreement with Tempo.[3] Under the parties' agreement, "If any action is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to recover its attorney's fees, costs and related expenses."

Parties are free to contract for a fee-recovery standard looser than the one provided by Chapter 38. *Boucher v. Thacker*, 609 S.W.3d 206, 208 (Tex. App.—Texarkana 2020, no pet.). The term "prevailing party" in a contract refers to the party who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not to the extent of its original contention. *Pinehurst/Fairmount Partners, L.P. v. Concrete Productions, Inc.*, No. 05-00-01223-CV, 2001 WL 832351, at *3 (Tex. App.—Dallas July 25, 2001, pet. denied). We determine whether a party prevailed by considering whether it was successful on the merits, which does not necessarily depend on whether damages were awarded. *Id.* But the "main issue" in a case may be whether one party owed another money, even if interpretation of a contract is an important part of the case, and in such a case, the party must recover damages to be the prevailing party. *Id.*

---

[3] At trial, J.W. later stated it was only seeking fees under the agreement.

Here, J.W. sued Tempo and alleged Tempo breached the contract by soliciting Amazon, causing J.W. contractual and actual damages. We must conclude this is a case where the main issue is whether one party owed the other money, so it was necessary for J.W. to recover money damages to prevail on the main issue in the case. Because we concluded the liquidated damages provision is unenforceable, the jury found for Tempo on its good faith defense to J.W.'s tortious interference claim, and J.W. failed to recover actual damages for its breach of contract claim, we reverse the judgment's award of costs for J.W. *See Intercontinental Group P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 655 (Tex. 2009) (party was not prevailing party under contract, despite finding of breach, when it recovered no damages on its claim and was thus not entitled to attorney's fees under the contract); *Greater Houston Radiation Oncology, P.A. v. Sadler Clinic Ass'n, P.A.*, 384 S.W.3d 875, 896 (Tex. App.—Beaumont 2012, pet. denied) (reversing award of attorney's fees under contract when court of appeals reversed basis for party to be considered prevailing party). We sustain Tempo's issue.

### 3. *$37,482 offset*

Next, Tempo asks us to modify the judgment to increase its damages award from $110,148.66 to $147,630.66. It argues the trial court erroneously deducted the offset amount found by the jury—$37,482—from the damages amount resulting from J.W.'s breach found by the jury—$147,630.66—because, Tempo contends, the jury's damages award appears to have already deducted the offset amount it found.

It bases this contention on the fact that the damages and offset amounts "when added together ($185,112.66) almost exactly equal the total amount Tempo 'contended was owed to Tempo'" ($185,118.41). Tempo cites no authority for this argument asking us to speculate about the basis for the jury's verdict. Consequently, we conclude this argument is inadequately briefed, and we overrule it. TEX. R. APP. P. 38.1(i) (argument must contain appropriate citations to authorities).

### 4. Attorney's fees for Tempo

Tempo argues a new trial should be granted on its claim for attorney's fees. As described above, Tempo presented evidence of its attorney's fees, yet the jury awarded no attorney's fees to Tempo. We conclude the jury's award of no fees was improper. While the jury could have rationally concluded a reasonable and necessary fee was less than that sought, an award of zero fees is unsupported by the evidence. *See Midland W. Bldg. L.L.C. v. First Serv. Air Conditioning Contractors, Inc.*, 300 S.W.3d 738, 739 (Tex. 2009) (per curiam); *Wagner v. Edlund*, 229 S.W.3d 870, 877 (Tex. App.—Dallas 2007, pet. denied). Accordingly, Tempo is entitled to a new trial on attorney's fees. *See id.* We sustain Tempo's issue.

## B. J.W.'s cross-appeal

### 1. Sufficiency of evidence supporting Tempo's award

In its first issue, J.W. argues insufficient evidence supports Tempo's award of damages, specifically contending the finding that J.W.'s performance was not excused is contrary to the fact that the materiality of Tempo's prior breach was

–19–

established as a matter of law and to the overwhelming weight and preponderance of the evidence and is manifestly unjust. We reject J.W.'s arguments.

Because the jury answered that J.W. failed to comply with the agreement, it was further required to determine whether J.W.'s failure to comply was excused. In question thirteen, the jury was instructed that J.W.'s failure to comply was excused by, among other things, Tempo's previous failure to comply with a material obligation of the agreement and it was instructed on factors to consider in determining materiality. The jury answered that J.W.'s failure to comply with the agreement was not excused. Thus, the jury necessarily found that Tempo's previous breach of the agreement was not material. *See Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (per curiam) (concluding jury made implied finding of non-materiality when it found second-to-breach party's performance was not excused).

Despite this, J.W. argues Tempo's breach was material as a matter of law. Materiality is generally an issue to be determined by the trier of fact, and like other issues of fact, it may be decided as a matter of law only if reasonable jurors could reach only one conclusion. *See id.* Factors significant in determining whether a failure to perform is material include: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to

–20–

perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 199 (Tex. 2004) (per curiam).

The jury was instructed to consider the *Mustang Pipeline* factors in determining whether Tempo's breach was material. Evidence was presented that could have led the jurors to reasonably conclude, in applying those factors, that Tempo's breach was not material, including evidence that J.W. employees invited Tempo to work directly with Amazon, that J.W. was winding down its relationship with Amazon regardless of any solicitation from Tempo, and that Tempo continued to work for J.W. despite also doing direct work for Amazon. This case is unlike *Mustang Pipeline*, where the supreme court found a material breach as a matter of law when a contractor failed to meet a construction deadline under a contract that stated, "all time limits stated in the Contract are of the essence to the Contract." *Id.* at 199–200. We do not find such conclusive evidence of materiality in this case. For the same reasons, we also conclude the jury's finding that J.W.'s performance was not excused was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242

(Tex. 2001) (per curiam) (describing factual sufficiency standard). J.W.'s first issue is overruled.

> ### 2. Sufficiency of the evidence supporting the finding of zero actual damages for J.W.

J.W. argues the jury ignored the undisputed evidence of its damages when it awarded J.W. zero damages for its breach of contract claim. In reviewing this challenge, we must determine whether the jury's finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 242. We consider and weigh all of the evidence and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.* In reviewing the evidence, we may not reweigh it and set aside the verdict merely because we feel a different result is more reasonable. *Lanier v. E. Foundations, Inc.*, 401 S.W.3d 445, 454–55 (Tex. App.—Dallas 2013, no pet.). The jury is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The jury may believe one witness and disbelieve another and resolve any inconsistencies in any witness's testimony. *Lanier*, 401 S.W.3d at 455. "The jury generally has great discretion in considering evidence on the issue of damages." *Grant v. Cruz*, 406 S.W.3d 358, 363 (Tex. App.—Dallas 2013, no pet.).

The jury was asked what sum of money would fairly and reasonably compensate J.W. for its damages, if any, "that resulted from Tempo's failure to comply" with the agreement, and it was instructed to consider lost profits that were "a natural, probable, and foreseeable consequence" of Tempo's failure to comply. The jury answered with zero dollars. We cannot conclude this verdict was against the great weight and preponderance of the evidence. As discussed above, Tempo presented evidence indicating J.W. was losing its Amazon business regardless of any actions taken by Tempo. Thus, the jury could have reasonably concluded no damages resulted from Tempo's breach or any lost profits were not a consequence of Tempo's breach. Further, we find no evidence in the record that Tempo took Amazon routes that J.W. otherwise would have taken. We overrule J.W.'s second issue.

3. *Sufficiency of the evidence supporting the jury's award of no attorney's fees*

Having reversed the award of costs to J.W., we also reject J.W.'s final alternative issue challenging the jury's award of zero attorney's fees for the same reason. Given the jury's findings of zero actual damages awarded to J.W. and Tempo's defense to J.W.'s tortious interference claim, and this Court's resolution of the liquidated damages provision, J.W. was not the prevailing party and was therefore not entitled to attorney's fees under the parties' agreement. J.W.'s final issue is overruled.

## III. Conclusion

We modify the trial court's judgment to remove the statement that Tempo take nothing on its counterclaims. We reverse the portion of the judgment awarding J.W. $621,850.44 for liquidated damages and costs and render judgment that J.W. take nothing on those claims. We reverse the portion of the trial court's judgment awarding Tempo zero attorney's fees and remand for further proceedings consistent with this opinion. The remainder of the judgment is affirmed.

/Ken Molberg/
KEN MOLBERG
JUSTICE

221035F.P05

–24–



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

TEMPO TRANSPORTATION,
LLC, Appellant


No. 05-22-01035-CV     V.


J.W. LOGISTICS OPERATIONS,
LLC, Appellee

On Appeal from the 219th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 219-02738-
2020.
Opinion delivered by Justice
Molberg. Justices Reichek and Smith
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** in part and **AFFIRMED** in part. We **REVERSE** the portion of the judgment awarding appellee J.W. LOGISTICS OPERATIONS, LLC $621,850.44 for liquidated damages and costs and **RENDER** judgment it take nothing on those claims. We **REVERSE** the portion of the judgment awarding appellant TEMPO TRANSPORTATION, LLC zero attorney's fees and **REMAND** for further proceedings consistent with this opinion. The remainder of the judgment is **AFFIRMED**.

It is **ORDERED** that appellant TEMPO TRANSPORTATION, LLC recover its costs of this appeal from appellee J.W. LOGISTICS OPERATIONS, LLC.


Judgment entered July 5, 2024.